# RICHMOND *v.* IRONS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Submitted January 7, 1887. — Decided March 28, 1887.

A bill in equity filed by a judgment creditor of an insolvent national bank, which alleges that the president of the bank, under cover of a voluntary liquidation, was converting its assets, in a manner stated in the bill, in fraud of the rights of the complainant and other creditors, and which prays a discovery of all the assets, and of what moneys and assets have come into the president's hands, and what disposition has been made of them, and that the sales and conveyances of corporation property may be set aside, and that the property of the bank may be delivered up to the court, and that a receiver be appointed, and that the proceeds of the property may be applied to the payment of the complainant's debt, is in fact a bill to obtain judicial administration of the affairs of the bank, and to thus secure the equal distribution of its property : and an amended bill which states that it is filed on behalf of the complainant and of all the creditors who may become parties, and which charges that some stockholders named have parted with their stock for assets of the bank after it had gone into liquidation and in fraud of the creditors, and which prays that all the stockholders may be individually subjected to the liability created by the statute, and that the fund realized from the assets and from this liability may be distributed among the creditors, is germane to the original bill, and does not materially change the substance of the case nor make it multifarious, so as to make the allowance of the amendment an improper exercise of the discretion of the Circuit Court, within the rule laid down in *Hardin* v. *Boyd,* 113 U. S. 761.

Under the original act respecting national banks, and before the act of June 30, 1876, 19 Stat. 63, a court of equity had jurisdiction of a suit to

prevent or redress maladministration or fraud against creditors in the voluntary liquidation of such a bank, whether contemplated or executed; and such suit, though begun by one creditor, must necessarily be for the benefit of all.

The act of June 30, 1876, 19 Stat. 63, whether considered as declaratory of existing law, or as giving a new remedy, warranted the Circuit Court in granting leave to file the amended bill in this case.

The rights, under a statute of limitations, of a creditor who becomes party to a pending creditors' bill depend upon the date of the filing of the creditors' bill, and not upon the date of his becoming a party to it.

The statutory liability of a shareholder in a national bank for the debts of the corporation survives against his personal representatives.

A stockholder in a national bank continues liable for the debts of the company, under the statutes of the United States, until his stock is actually transferred upon the books of the bank, or until the certificate has been delivered to the bank, with a power of attorney authorizing the transfer, and a request, made at the time of the transaction, to have the transfer made: a delivery to the president of the bank as vendee and not as president is insufficient to discharge the shareholder under the rule in *Whitney* v. *Butler,* 118 U. S. 655.

Without express authority from the shareholders in a national bank, its officers, after the bank goes into liquidation, can only bind them by acts implied by the duty of liquidation.

Creditors of a national bank who, after it suspends payment and goes into voluntary liquidation, receive in settlement of their claims bills receivable, indorsed or guaranteed in the name of the bank by its president, cannot claim as creditors against the stockholders; as the original debt is paid, and the stockholders, in the absence of express authorization, are not liable on the contract of indorsement or guarantee, made after suspension.

A shareholder in a national bank, who is liable for the debts of the bank, is liable for interest on them to the extent to which the bank would have been liable, not in excess of the maximum liability fixed by the statute.

The expenses of a receivership of a national bank appointed in a creditors' suit, contesting a voluntary liquidation of the bank, cannot be charged upon stockholders as part of their statutory liability, but must come from the creditors, at whose instance the receiver was appointed.

No person is entitled to share as a creditor in the distribution under a creditor's bill, who does not come forward to present his claim.

THE original bill in this case was filed February 3, 1875, by James Irons, the defendants being the Manufacturers' National Bank of Chicago, organized under the national banking act, and Ira Holmes, its president. The bill alleged that the complainant had recovered a judgment against the bank for the sum of $12,408.51 damages, besides costs, an execution on

which had been returned unsatisfied; that on or about October 11, 1873, the bank had suspended payment and business, and, in pursuance of § 44 of the banking law, had gone into voluntary liquidation, its affairs having been put into the hands of the defendant Holmes, its president, for that purpose; that the defendant Holmes had thereafter settled a large amount of the indebtedness of the bank by giving notes made by him as president of the bank and guaranteed by him as such, and by using the assets of the bank in payment of its indebtedness; that he had also converted and appropriated to his own use an amount of the assets of the bank charged to be not less than $250,000; that he also had in his possession and control a large amount of the personal and real property purchased with the funds and moneys of the bank, but which he had fraudulently withheld and disposed of for his own use; "that the said voluntary liquidation aforesaid, and the proceedings thereunder by the said defendant Holmes, were a pretence and sham, and were suggested, instituted, and carried on for the sole and only purpose of concealing and covering up the transactions of the said bank, and of dissipating and disposing of its assets in such a way and manner most agreeable to the wishes and interests of the said defendant Holmes and those in his interest, and in fraud of the rights of your orator and the other creditors of the said bank;" that the capital stock of the bank actually paid in amounted to the sum of $500,000, owned by twenty-four stockholders, a schedule of the names of whom, with their respective places of residence, and the number of shares owned by each, were set out in an exhibit to the bill.

The bill prayed for a discovery under oath of "what moneys, cash, notes, bills receivable, United States bonds, and other property and effects the said bank had in its possession and was the owner of at the time of the said suspension thereof, and at the time the same went into voluntary liquidation in the manner as aforesaid, or what moneys, cash, notes, bills receivable, United States bonds, and other property the said bank has since had in its possession or control, or been the owner of, or the said Holmes, as president thereof, or other-

wise, has since had in his possession or control belonging to the said bank, and what disposition, payment, sale, or transfer has been made of the property and effects of the same and every part thereof." It also prayed that all sales and conveyances made by the bank or by the defendant Holmes of property belonging to the bank might be set aside as fraudulent, and that all the property and effects of the bank in its possession, or in the possession of Holmes, might be delivered up into the possession and control of the court, and applied, so far as necessary, to the payment of the complainant's judgment; that the defendants might be enjoined from making any further transfers of the property of the bank; that a receiver might be appointed of all the property and effects of the bank, and for general relief.

At various times subsequent to the filing of the bill other judgment creditors of the bank filed petitions for leave to be made parties, and were allowed to join in the bill as co-complainants. On the 12th of February, 1875, the defendants interposed a demurrer to the bill. The grounds of the demurrer were, among others, that a creditor's bill in behalf of one or more creditors would not lie, because the assets must be equally distributed among all; that a receiver of a national bank could only be appointed and the assets distributed by the Comptroller of the Currency under the act of Congress, and that the court had no power to enjoin a national bank from disposing of its assets in voluntary liquidation.

On the 26th of February, 1875, the demurrer was overruled, and Joel D. Harvey was appointed a receiver with full power and authority to take and receive possession and control of all the property of the bank, with directions to collect and convert the same into money, to be applied according to the order and direction of the court.

On the 1st of April, 1875, the defendants filed a joint and several answer to the bill. They admitted that the bank went into voluntary liquidation on September 26, 1873, and between that time and the time of filing the bill that it settled a large amount of its indebtedness, so that there remained due to its depositors only $39,000; and alleged that these settlements

were made mainly by paying out to creditors the assets of the bank, in some cases the defendant Holmes giving his personal obligations, which in a few instances were endorsed by him as president of the bank. The defendant Holmes denied all the fraud charged in the bill, and particularly that he had converted and appropriated to his own use any of the assets of the bank, and denied that he had any of such assets in his possession or under his control; and alleged, on the other hand, that he had given his private obligations in payment of the debts of the bank, which had more than exhausted all his resources and brought him into a state of bankruptcy.

The said Holmes, as president, and for himself personally, also averred in the answer, "that at the time said bank went into voluntary liquidation as aforesaid he verily believed that said bank and himself were solvent, and would be able to pay their debts in full by making settlements with the creditors to their satisfaction, and they, these defendants, so believed, while making said settlements, and he was advised by his attorneys, and so believed himself, that all settlements made with the creditors of said bank in the manner aforesaid, pursuant to said 42d section of the national banking act, would be valid, and that both said bank and its creditors so settled with would be protected, and that said settlements could not be set aside or in any manner interfered with; that, acting upon this advice, and what he believed to be the unquestioned law in the premises, said bank and its creditors, believing that they were within the letter and spirit of said section of the banking act, effected settlements to the amount of about $900,000, aside from reducing its capital stock to $178,000, and these defendants now claim that said settlements are all valid, and cannot be inquired into."

On October 5, 1876, leave was given the complainant to file an amended bill making additional defendants, and it was filed on the same day. The amended bill alleged that the bank suspended payment on September 22, 1873; that it had been previously and ever since had continued to be insolvent; that the complainant was a creditor by judgment, as stated in the original bill, on which execution had been returned

unsatisfied; that the bank, after suspending payment, went into voluntary liquidation under the management of the defendant Holmes, who settled a large amount of the indebtedness of the bank, so as to reduce it to about $40,000. The amended bill then set out the names of the various stockholders of the bank, with the amount of shares owned by each, and alleged that while the bank was contemplating insolvency, and was in fact insolvent, and after the suspension of payment, certain of the persons named as stockholders, and who were also made defendants, combining and confederating with the defendant Holmes, surrendered and delivered up to him, the said Holmes, the certificates of shares of stock held by them respectively, on some pretended contract of purchase, the same having been purchased with the money and assets of the bank, and cancelled at the request and by the direction of the said stockholders for the avowed purpose of releasing them, and each of them, from any personal liability on account thereof to the creditors of the said bank; but that, nevertheless, the same were never in fact cancelled or transferred on the books of the bank, but then stood on said books in the names of the said defendants; and it was charged that the said pretended purchase and attempt at cancellation of the said stock was a fraud upon the complainant and the other creditors of the said bank, and should be set aside.

The bill accordingly prayed for a discovery from the defendants of the facts in relation to the said transactions, and that the same might be set aside and decreed to have been made in fraud of the rights of the complainant and the other creditors of the bank; and "that the said stockholders, and each of them, be subjected to the liability created by the statute thereon in the same manner and to the same extent as though such sales, transfers or surrenders had never been made; and that the said stockholders, or such of them as have sold, transferred or surrendered, or pretended to sell, transfer or surrender, &c., the shares of stock so as aforesaid held and owned by them at the time the said bank suspended payment, in the manner as aforesaid, may be decreed to hold the moneys, property and effects received by them for said stock, in the

manner as aforesaid, in trust for the creditors of the said bank, and, upon the respective amounts being ascertained, that they be decreed to pay the same to creditors thereof, or to such person or persons as your honors shall order and direct."

The bill also prayed "that an account be taken of the amounts due from each of the said defendants to your orator and the judgment and other creditors of the said bank as stockholders thereof, upon the basis of the number of shares of stock held by them at the time the said bank suspended payment in the manner as aforesaid, in pursuance of the provisions of the act under which the said bank was organized, and by which the liability of the stockholders thereof is fixed and determined. That a full and complete and accurate account be taken of all the sales, transfers or surrenders, or pretended sales, transfers, &c., of stock made by the said stockholders of the said bank, or any of them, after the same suspended payment in the manner as aforesaid, and to the amounts received by them respectively for any such sales, transfers, &c., and that they may be decreed to hold the same in trust for the creditors of said bank in the manner as hereinbefore prayed, and that upon such accounts being taken the said defendants, or such of them as shall be found liable to your orator and the judgment and other creditors of the said bank upon the said stock liability created by the said banking act, and such of them as shall be liable for the amounts received by them for the sales and transfers of stock so made by them in the manner as aforesaid, be decreed to pay whatever amount shall be due from them, and each of them respectively, into court or to the receiver duly appointed by said court, and that out of the fund so created your orator's judgment be paid in full, and the balance thereof be distributed among the other creditors of said bank in such way and manner as your honors shall direct."

All of the defendants named in the amended bill within its jurisdiction were served with process and appeared. On behalf of certain of these defendants a motion was made to strike the amended bill from the files, and others filed demurrers, for the reason, in substance, that it made a new

case, different from that set out in the original bill, and inconsistent with it, containing matters and asking relief that could only be properly obtained by an original bill.

On the 9th of May, 1877, the complainant, James Irons, having died, a bill of revivor was filed in the name of his personal representatives.

On October 1, 1878, the motion to strike from the files and the demurrers interposed to the amended bill were overruled, and the defendants required to answer. Subsequently, answers were filed at various times by the several defendants who appeared, the contents of which it is not necessary here particularly to notice, except to say that issue was joined by replication duly filed. On July 23, 1883, on the final hearing, the complainant had leave to amend, and did amend, the amended bill of complaint so as to allege expressly that it was filed on behalf of himself and all other creditors of the Manufacturers' National Bank of Chicago; the prayer being amended so as to require an account to be taken of the amount due the complainant and other creditors of the defendant; striking out those parts which asked that the complainant's judgment be decreed to be a first lien on the property of the bank, and paid first in full out of the fund for distribution; and adding a prayer that the fund so created might be distributed among all the creditors of said bank *pro rata*, in such a way and manner as should be directed. To this amended bill, as finally amended, various defendants filed several answers *instanter*, setting up by way of a bar to the relief prayed for against the defendants, as holders of the shares of stock in the banking association, the statute of limitations of five years of the state of Illinois; and also insisting that the bill as amended was multifarious and inconsistent, because it prayed for further and different relief from that authorized by the act of Congress approved June 30, 1876. On the same day a decree was entered in the cause, which found, among other things, as follows: That the Manufacturers' National Bank of Chicago became insolvent and suspended payment September 22, 1873, and, in pursuance of the act of Congress, went into voluntary liquidation on September 26, 1873; that

debts of the bank were still due and unpaid; that, at the time
of the bank's insolvency and suspension of payment, the capi-
tal stock of the bank consisted of 5000 shares, of the par
value of $100 each, setting out the names of the owners
thereof, with the number of shares owned by each; that after
the said bank had become insolvent and suspended payment,
certain shareholders of said bank transferred the stock held
by them, but that all and each of such transfers were and are
in derogation of the rights of creditors, and were and are
invalid; and that certain named defendants, shareholders of
said bank, setting out their names, are individually responsible,
equally and ratably, and not one for the other, for all con-
tracts, debts, and engagements of the bank to the extent of
the amount of stock standing in their names respectively, on
the 23d of September, 1873, and before any transfers were
made that day, at the par value thereof, in addition to the
amount invested in such bank.

. The death of a defendant, William H. Adams, on the 5th
of June, 1882, was suggested, and Elizabeth Adams, his execu-
trix, made a party defendant in his stead.

By an order entered May 7, 1879, the case was referred to
Henry W. Bishop, Esquire, a master in chancery, to take proof
and report, first, the amount of the debts of said bank still
unpaid and the amount due each creditor thereof; second, the
value of the assets, if any, of the bank; third, the amount of
assessment necessary to be made on each share of the capital
stock of said bank in order to fully pay the indebtedness of
the bank, and the amount due and payable from each share-
holder upon such assessment.

On the 6th of January, 1885, the master reported his find-
ings under the decree of July 23, 1883. He reported the
amount of the debts of the bank unpaid as of the 1st of
November, 1884, to be $368,971.50, the name of each creditor
and the amount due him being set out in a schedule. The
claims of these creditors were also classified by the master as
follows: 1st, for clerical services to the bank, $183.31; 2d, for
past services of the receiver and his attorneys, $4437.04; 3d,
claims arising before the failure of the bank, upon which no

collaterals were taken, $179,231.81; 4th, claims arising before the failure of the bank, on account of which worthless collaterals had been subsequently received, $185,119.34. The master further reported that there were no assets of the bank outside of the stockholders' liability, and that the amount of assessment necessary to be made upon each share of the capital stock of the bank, in order to fully pay the indebtedness, was ninety per cent. A schedule attached to the report gave the name of each stockholder, and opposite his name the number of his shares of stock in the bank, the par value thereof, the per cent. of assessment to be levied thereon, and the amount due and payable from him upon such assessment. These stockholders were also classified as embracing, 1st, stockholders who had been duly served with process or entered their appearance in the cause; 2d, stockholders who had obtained a discharge in bankruptcy and were not liable to stock assessments on that account; and, 3d, stockholders who resided outside the jurisdiction of the court and had not been found within the district.

On February 2, 1885, various exceptions were filed on behalf of the defendant stockholders to this report of the master. An exception thereto was also filed on behalf of the receiver and creditors so far as it reported in favor of certain stockholders claiming to have been discharged from their liability by their certificates in bankruptcy. Upon the hearing of these exceptions, the court referred the cause again to the master to compute from the proofs already taken in the cause, 1st, the indebtedness of the bank at the time of the failure; 2d, subsequent actual payments upon indebtedness; 3d, net amount of indebtedness, with interest on same at the rate of six per cent. per annum from the time of the failure of the bank; and, 4th, the necessary assessment upon the stockholders to pay said indebtedness, including the expenses of the receivership.

In pursuance of this direction, on the 25th of May, 1886, the master made a supplemental report, in which he found that the indebtedness of the bank at the time of the failure thereof, to wit, the 23d day of September, 1873, amounted in

the aggregate to the sum of $410,064.10; that the subsequent actual payments upon said indebtedness amounted to the sum of $213,018.46; that the net amount of the indebtedness was the sum of $197,045.64; that the interest upon said last mentioned sum from the 23d of September, 1873, when the bank failed, down to May 21, 1886, at the rate of six per cent. per annum, was the sum of $149,686.98, making the total unpaid indebtedness of said bank on the last mentioned date the sum of $346,732.62; that twenty per cent. upon said last mentioned sum, amounting to the sum of $69,346.52, was necessary to be added thereto for the expenses of the receivership, making a total sum of $416,079.11; and that the necessary assessment upon the stockholders to pay said indebtedness, including the expenses of the receivership, was 83.2 per cent. upon the capital stock of $500,000.

In addition to those filed to the original report, exceptions were filed to the supplemental report, objecting to the allowance of interest upon the claims of the creditors, and to the addition of twenty per cent. to the amount of the indebtedness, for the purpose of providing for the payment of the expenses of the receivership. All the exceptions to the master's reports were overruled, and a final decree was entered against the defendants according to its findings; a decree being entered against each stockholder defendant severally for the amount computed to be due from him upon the assessment of the stock ascertained to be standing in his name on the books of the bank at the date of its suspension, at the rate of assessment fixed in the report of the master. From this decree Alonzo Richmond, Charles Comstock, Thomas Lord, and William Henri Adams, administrator *de bonis non* of the estate of William H. Adams, deceased, severally appealed.

*Mr. Henry G. Miller* for appellant Richmond.

I. The bill, as amended in October, 1876, was an ordinary creditor's bill, and under it the court could only reach the assets of the bank for the benefit of the complainant and the judgment creditors of the bank who had been permitted by the court to prosecute as cocomplainants. As the statutory

liability of the stockholders was not to the bank, but to the creditors of the bank, and therefore not an asset of the bank, it could not be enforced in this proceeding, and the bill should have been dismissed at the hearing as to those of the stockholders who were not charged with holding the property of the bank received in exchange for stock. *Hicks* v. *Burns*, 38 N. H. 141; *Jacobson* v. *Allen*, 12 Fed. Rep. 454; *Story* v. *Furman*, 25 N. Y. 214; *Dutcher* v. *National Bank*, 12 Blatchford, 435; *Bristol* v. *Sanford*, 12 Blatchford, 341; *Pollard* v. *Bradley*, 20 Wall. 520; *Egberts* v. *Wood*, 3 Paige, 517;[1] *Fish* v. *Howland*, 1 Paige, 20; *Brown* v. *Ricketts*, 3 Johns. Ch. 553; *Walker* v. *Devereaux*, 4 Paige, 229; *Joy* v. *Wirtz*, 1 Wash. C. C. 417; *Whitney* v. *Mayo*, 15 Ill. 251; *Harper* v. *Union Mf'g Co.*, 100 Ill. 225; *Stedman* v. *Eveleth*, 6 Met. (Mass.) 114; *Knowlton* v. *Ackley*, 8 Cush. (Mass.) 93; *Gray* v. *Coffin*, 9 Cush. (Mass.) 192; *Chase* v. *Lord*, 77 N. Y. 1; *Hoard* v. *Wilcox*, 47 Penn. St. 51.

II. As the right to enforce the statutory liability of stockholders by a proceeding in chancery under the second section of the act of July 30, 1876, accrued to complainant and other creditors of the bank long after the original bill was filed, it cou'd not be enforced under an amendment of the bill, but should have been made the subject matter of an original suit. *Shields* v. *Barrow*, 17 How. 130; *Pirich* v. *Anthony*, 10 Allen, 470; *Milner* v. *Milner*, 2 Edwd. Ch. 114; *Pilkington* v. *Wignall*, 2 Madd. 240, 244; *Pritchard* v. *Draper*, 1 Russ. & Myln. 191; *Mason* v. *Railroad Co.*, 10 Fed. Rep. 334; *Verplank* v. *Mercantile Ins. Co.*, 1 Edwd. Ch. 46; *Crabb* v. *Thomas*, 25 Ala. 212; *Conroy* v. *Smith*, 11 Geo. 539; *Fenno* v. *Coulter*, 14 Ark. 38; *Williams* v. *Starke*, 2 B. Mon. 196; *Platt* v. *Squire*, 5 Cush. (Mass.) 551; *Ryan* v. *Tallmadge*, 1 Johns. Ch. 184; *Belknap* v. *Stone*, 1 Allen, 572; *Sanborn* v. *Sanborn*, 7 Gray, 142.

III. The bill as amended was multifarious as charged by Richmond in his amended answer of July 23, 1883, and for that reason should have been dismissed. *Sexton* v. *Davis*, 18

---

[1] *S. C.* 24 Am. Dec. 236.

Ves. 72; *Dimmock* v. *Bixby*, 20 Pick. 368; *Cambridge Water Works* v. *Somerville Dyeing Co.*, 14 Gray, 193; *Pope* v. *Leonard*, 115 Mass. 286; *Wiles* v. *Suydam*, 64 N. Y. 173.

IV. Nearly all the claims which the stockholders are by the final decree required to pay were as against the stockholders barred by the statute of limitations[1] long before they were presented, or any steps taken against the stockholders to enforce their payment, and this neglect to prosecute should be regarded as conclusive evidence of an abandonment by these creditors of their causes of action against the stockholders, if any existed. *Carol* v. *Green*, 92 U. S. 509; *Sugar River Bank* v. *Fairbank*, 49 N. H. 131; *Bank of the United States* v. *Daniel*, 12 Pet. 32; *Gilfillan* v. *Union Canal Co.*, 109 U. S. 401; *Allen* v. *Link*, 5 Lea, 454; *Christmas* v. *Mitchell*, 3 Iredell Eq. 535; *Miller* v. *McIntyre*, 6 Pet. 61; *Holmes* v. *Trout*, 7 Pet. 171; *Sicard* v. *Davis*, 6 Pet. 124; *Gorman* v. *Judge*, 27 Mich. 138; *Hubbell* v. *Warren*, 8 Allen, 173; *Neve* v. *Weston*, 3 Atk. 557; *Rogers* v. *King*, 8 Paige, 209; *Berrington* v. *Evans*, 1 You. & Coll. (Ex.) 434; *Sterndale* v. *Hankinson*, 1 Simons, 393.

V. Stockholders can only be required to pay the debts of the bank as they existed at the time it went into liquidation. *Fleckner* v. *Bank of the United States*, 8 Wheat. 338; *National Bank* v. *Atlas Bank*, 9 Met. (Mass.) 182; *United States* v. *Knox*, 102 U. S. 422; *Patterson* v. *Lynde*, 106 U. S. 519; *White* v. *Knox*, 111 U. S. 784; *Parker* v. *Macomber*, 18 Pick. 505; *Parrott* v. *Colby*, 6 Hun 55, affirmed 71 N. Y. 597; *Cherry* v. *Lamar*, 58 Geo. 541; *Branch* v. *Kraffi*, 61 Geo. 614; *Terry* v. *Anderson*, 95 U. S. 628; *Bassett* v. *Hotel Co.*, 47 Vt. 313.

---

[1] The following is § 15 of the statute of Illinois entitled "Limitations," in force when this right of action accrued, and which is still in force: "Actions on unwritten contracts, express or implied, or on awards of arbitration, or to recover damages for an injury to property real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within five years next after the cause of action accrued."

VI. The court erred in directing each stockholder to pay the amount assessed upon his stock to the receiver appointed by the court in the proceeding by creditors' bill, long before the stockholders were made parties defendant, and in including in such assessment the cost of the receivership. *Slee* v. *Bloom*, 20 Johns. 669; *Moss* v. *McCullough*, 5 Hill, 131; *Bonaffe* v. *Fowler*, 7 Paige, 576; *Pollard* v. *Bailey*, 20 Wall. 520; *Carol* v. *Green*, 92 U. S. 509.

VII. The court erred in including in the decree the sum of $149,686.98 for interest.

VIII. The court erred in overruling the exceptions, and each of them, to the master's reports, and in rendering a decree upon the master's supplementary report.

IX. The court erred in rendering a decree against appellant Comstock, as the owner of 150 shares of stock, whereas he was not liable in any view, to exceed 50 shares.

And herein also the court erred in setting aside transfers of stock in favor of creditors who did not attack the same until years after the statute of limitations had barred such attack.

*Mr. H. B. Hurd* for appellants cited the following cases not cited by *Mr. Miller* or by *Mr. Fuller.* (1) As to the statutory liability: *Burnham* v. *Wellensberg Coal Co.*, 47 Penn. St. 49; *Brown* v. *Eastern State Co.*, 134 Mass. 590; *O'Reilly* v. *Bard*, 105 Penn. St. 569; *Farnsworth* v. *Wood*, 91 N. Y. 308; *Wright* v. *McCormack*, 17 Ohio St. 86; *National Bank* v. *Insurance Co.*, 104 U. S. 54; *Hanson* v. *Donkersley*, 37 Mich. 184; *Powell* v. *Eldred*, 39 Mich. 552.

*Mr. Melville W. Fuller* for appellants:

I. The Circuit Court erred in allowing the amendment of July 23, 1883, by which it was attempted to turn a creditors' bill into an original bill for the enforcement of a statutory stock liability under the act of June 30, 1876. *Hatch* v. *Dana*, 101 U. S. 205; *Patterson* v. *Lynde*, 112 Ill. 196; *Terry* v. *Anderson*, 95 U. S. 628; *Walker* v. *Powers*, 104 U. S. 245; *Shields* v. *Barrow*, 17 How. 130; *Smith* v. *Woolfolk*, 115 U. S. 143.

II. The court erred in holding that the amended bill of October 5, 1876, was a supplemental bill, and, as such, sustainable under the act of Congress of June 30, 1876. *Milner* v. *Milner,* 2 Edwd. Ch. 114; *Pinch* v. *Anthony,* 10 Allen, 470.

III. The court erred in holding that the amended bill of October 5, 1876, was a bill on behalf of the complainant and all other creditors.

IV. The court erred in holding and proceeding to decree upon the theory that the statutory stock liability was part of the assets of the bank. *Irons* v. *Manufacturers'. Bank,* 6 Bissell, 301; *Godfrey* v. *Terry,* 97 U. S. 171; *Terry* v. *Tubman,* 92 U. S. 156; *Carol* v. *Green,* 92 U. S. 509; *Jacobson* v. *Allen,* 12 Fed. Rep. 454; *Insurance Co.* v. *Bank,* 104 U. S. 54; *Pollard* v. *Bailey,* 20 Wall. 520.

V. The court erred in overruling the defence of the statute of limitations and in rendering a decree against the stockholders for an amount covering the entire alleged indebtedness of the bank with interest, when as to the largest part thereof the claims were barred by that statute. *Quayle* v. *Gauld,* 91 Ill. 378; *Hancock* v. *Harper,* 86 Ill. 445; *Carol* v. *Green,* 92 U. S. 509; *Wright* v. *McCormack,* 17 Ohio St. 86; *Hewett* v. *Adams,* 50 Maine, 271; *Hawthorne* v. *Calef,* 2 Wall. 10. (2) As to the effect of going into liquidation: *Miller* v. *White,* 50 N. Y. 137; *McMahon* v. *Macy,* 51 N. Y. 155; *Laidley* v. *Kline,* 8 W. Va. 218; *Foster* v. *Crenshaw,* 3 Munf. 514; *Shields* v. *Anderson,* 3 Leigh, 789; *McDowell* v. *Goldsmith,* 24 Maryland, 214; *Trippe* v. *Huncheon,* 82 Ind. 307; *Larrabee* v. *Baldwin,* 35 Cal. 155; *Hastings* v. *Drew,* 76 N. Y. 9. As to the Statute of Limitations: *Abrahams* v. *Myers,* 40 Maryland, 499; *Hall* v. *Cresswell,* 12 G. & J. 36; *Perry* v. *Turner,* 55 Missouri, 418; *Umsted* v. *Buskirk,* 17 Ohio St. 113

*Mr. D. J. Schuyler* and *Mr. Edward G. Mason* for appellees cited:

To the point that the bill was properly amended to enforce stock liability and was not multifarious. *Ogden* v. *Thornton,* 30 N. J. Eq. 569; *Hill* v. *Filkin,* 2 P. Wms. 6; *Pollard*

v. *Bailey*, 20 Wall. 509; *Horner* v. *Henning*, 93 U. S. 228; *Patterson* v. *Lynde*, 112 Ill. 196; *Bank* v. *Kennedy*, 17 Wall. 19; *Casey* v. *Galli*, 92 U. S. 512; *Pennell* v. *Lamar Ins. Co.*, 73 Ill. 303; *Derrick* v. *Lamar Ins. Co.*, 74 Ill. 404; *Battle* v. *The Mutual Ins. Co.*, 10 Blatchford, 417; *Harper* v. *Union Mfg. Co.*, 100 Ill. 225; *Moore* v. *Reynolds*, 109 Mass. 473; *Atlas Bank* v. *Nahant Bank*, 23 Pick. 480; *Harvey* v. *Lord*, 10 Fed. Rep. 236; *Mix* v. *Beach*, 46 Ill. 311; *Planters' Bank* v. *Sharp*, 6 How. 301; *Bronson* v. *Kinzie*, 1 How. 316; *Mc-Dougald* v. *Dougherty*, 14 Geo. 674; *Brinkerhoff* v. *Brown*, 6 Johns. Ch. 139; *Hallett* v. *Davis*, 2 Paige, 15; *Thompson* v. *Brown*, 4 Johns. Ch. 619; *Morgan* v. *New York & Albany Railroad*, 10 Paige, 290.[1] That interest runs on debts of the bank: *Brown* v. *Lamb*, 6 Met. 203; *Atlas Bank* v. *Nahant Bank*, 3 Met. 581; *National Bank of the Commonwealth* v. *Mechanics' National Bank*, 94 U. S. 437. That the statute of liquidations was not a bar, and that the voluntary liquidation was a waiver of the statute: *Borders* v. *Murphy*, 78 Ill. 81; *Clements* v. *Moore*, 6 Wall. 299; *Scovill* v. *Thayer*, 105 U. S. 143; *Philippi* v. *Philippe*, 115 U. S. 151. That the stock transfers were invalid: *Sawyer* v. *Hoag*, 17 Wall. 610; *First National Bank* v. *Smith*, 65 Ill. 44; *Wheelock* v. *Kost*, 77 Ill. 296; *Brown* v. *Adams*, 5 Bissell, 181; *Hale* v. *Walker*, 31 Iowa, 344; *Bowden* v. *Farmers' Bank*, 1 Hughes, 307; *Adderly* v. *Storm*, 6 Hill, 624; *National Bank* v. *Case*, 99 U. S. 628; *Nathan* v. *Whitlock*, 9 Paige, 152; *Bowden* v. *Santos*, 1 Hughes, 158; *Wager* v. *Hall*, 16 Wall. 584; *Bowden* v. *Johnson*, 107 U. S. 251; *Whitney* v. *Butler*, 118 U. S. 655. That the expenses of the receivership should be assessed upon stockholders: *Irons* v. *Manufacturers' Bank*, 21 Fed. Rep. 197; *Morrison* v. *Price*, 23 Fed. Rep. 217. That the stock liability survives against the estate of a deceased shareholder: *New England Bank* v. *Stockholders*, 6 R. I. 154;[2] *Deming* v. *Bull*, 10 Conn. 409; *Davis* v. *Weed*, 44 Conn. 569, 581; *Boston Glass Manufactory* v. *Langdon*, 24 Pick. 49, 52;[3] *Russell* v. *McLellan*, 14 Pick. 63, 69; *Hutchins* v. *State Bank*, 12 Met. (Mass.) 421; *Grew* v. *Breed*, 10 Met. (Mass.) 569, 576.

---

[1] *S. C.* 40 Am. Dec. 244.    [2] *S. C.* 75 Am. Dec. 688.    [3] *S. C.* 35 Am. Dec. 292.

*Mr. James H. Roberts* for the bankrupt Holmes.

MR. JUSTICE MATTHEWS, after stating the case as above reported, delivered the opinion of the court.

Some of the questions raised by the assignments of error are common to all the appellants, and others are peculiar to the individual cases. So far as necessary to the disposition of the case, they will be considered in their order.

The first assignment of error relates to the pleadings. It is objected that the court erred in permitting the complainant to file the amended bill of October 5, 1876, and also in permitting the amendment made at the hearing on July 23, 1883, and we are asked to reverse the decree on that account, and on remanding the cause to direct that the amended bill as amended be dismissed. The grounds of objection to the amendments as made are : 1st, that the amended bill stated a case entirely different from that contained in the original bill; and, 2d, that it made the bill as amended multifarious. The changes made in the case as originally stated in the bill are alleged to be : 1st, that it converted a creditor's bill, the object of which was to subject to the payment of the complainant's judgment assets of the corporation which could not be reached at law, into a bill for the additional purpose of enforcing the statutory liability of the stockholders of the bank to answer for its contracts, debts, and engagements ; and, 2d, that it converted the bill filed by the complainant in his own right into a bill on behalf of himself and all other creditors of the corporation.

It is a mistake, however, to assume that the bill as originally filed was strictly and technically a creditor's bill merely, for the purpose of subjecting equitable assets to the payment of the complainant's judgment. That undoubtedly was a part of its purpose and prayer, and in pursuance of it a small amount of the assets of the bank was recovered by the receiver, converted into money, and applied to the payment of the costs in the cause, but the whole of this recovery amounted only to $3346.96, and it was not until after this result became manifest that application was made and leave given to file the

amended bill. But the main purpose of the bill as originally framed was to obtain a judicial administration of the affairs of the bank on the ground that its capital stock and property was a trust fund for the benefit of its creditors, the company being insolvent and in liquidation, and that under the management of its officers and directors this trust was being violated and perverted. The bill contained allegations that Holmes, the president and manager of the bank, had converted its assets to his own use and to the use of others, in violation of his trust and in fraud of creditors, applying the assets of the bank so as to prefer some creditors over others, and otherwise dissipating and squandering them. It accordingly prayed for a full discovery of all the transactions on the part of Holmes in reference to the affairs of the bank since its suspension, for an injunction prohibiting any further transfers of its assets, for the appointment of a receiver with the general powers of receivers in like cases, and for general relief.

If this bill had been prosecuted, as originally framed, to final decree, and had resulted in the recovery of assets of the bank applicable to its purposes, it would necessarily have been made to appear during the progress of the suit that there were other creditors of the bank equally entitled with the complainant to share in the fruits of the litigation. The relief that would have been granted in such circumstances would have been by means of a decree distributing the assets obtained, equally among all the creditors, including the complainant, who, in respect to such assets, would have been entitled to no priority, either by virtue of having reduced his claim to judgment or by reason of having first filed a bill to enforce the trust. In the case of an insolvent incorporation thus brought into liquidation, and wound up by judicial process at the suit of a creditor, whether he sues in his own right, or on behalf of himself and other creditors, the rule of distribution is the same, and is founded upon the principle of equality in which equity delights; unless a claimant or some other judgment creditor had, previously to the filing of the bill, obtained a lien at law upon some portion of the property distributed, or could establish a superior equity, existing at the

time of the filing of the bill. *Curran* v. *Arkansas*, 15 How. 304; *Wood* v. *Dummer*, 3 Mason, 308; *Ogilvie* v. *Knox Ins. Co.*, 22 How. 380, 387; *Sawyer* v. *Hoag*, 17 Wall. 610.

When the amended bill was filed, the resources of the bank, discovered and delivered to the receiver, had been exhausted. The amended bill set out the names of all the stockholders, and all of those claimed to have been stockholders at the date of the suspension by name, with the number of shares belonging to each. It charged that certain of them combined and confederated with the defendant Holmes for the purpose of committing a fraud upon the creditors of the bank, by surrendering and transferring their shares of stock, receiving in exchange therefor a portion of the assets of the bank applicable to the payment of its debts. It accordingly prays, as a part of the relief, that these transactions may be inquired into and set aside; that the assets of the bank so received by any of these stockholders may be decreed to be delivered up and applied to the payment of the debts of the bank; and that, in addition thereto, an account be taken of all the present indebtedness of the bank and of the amounts due from each of the defendants "to your orator and the judgment and other creditors of the said bank as stockholders thereof, upon the basis of the number of shares of stock held by them at the time the said bank suspended payment in the manner as aforesaid, in pursuance of the provisions of the act under which the said bank was organized, and by which the liability of the stockholders thereof is fixed and determined."

In some respects it is quite true that this amended bill is a departure from the case as stated in the original bill. It was, however, germane to the original bill to have included in it the statements of the amended bill in respect to such of the stockholders as were charged by name with having, in combination with the president of the company, sold their stock, receiving assets of the bank in payment therefor after it had gone into liquidation, or in contemplation of insolvency, and in fraud of the creditors. Assets of the bank received by any of them in such circumstances were such as were clearly within the purview of the bill as originally framed, and those

allegations were certainly the subject of a proper amendment. Having thus brought in a number of the stockholders properly as defendants, to subject them to a decree to account for assets of the bank received by them in breach of trust and in fraud of creditors, it does not seem inappropriate or foreign to the general purposes of the bill for the court, also having jurisdiction over them in behalf of the complainant, who, as we have seen, necessarily represented all creditors entitled to share in the results of the suit, to proceed also upon the basis of granting the additional and complete relief prayed against them as stockholders, requiring them to answer under the statute for all the contracts, debts, and engagements of the bank. But to do this made it necessary to bring in also all other stockholders of the bank within the reach of the process of the court, although they may not have been charged as participating in the alleged breaches of trust and frauds. The various matters, therefore, contained in the amended bill and the original bill were thus connected with each other in such a way as fairly to bring the question of granting leave to file the amended bill within the discretion of the court below. In reviewing the exercise of that discretion on this appeal, we should not feel justified in any case in reversing the action of the Circuit Court, if it appeared that the appellants were not put to any serious disadvantage or materially prejudiced thereby. The amendment made at the hearing, whereby the amended bill was changed so as to state that it was filed by the complainant on behalf of himself and all other creditors, we regard as purely formal and properly permitted for the purpose of making the bill explicitly to conform to all that had taken place previously in the progress of the cause. The litigation had been conducted, from the time of the filing of the first amended bill, upon the supposition and theory that it included in its scope all creditors of the bank alike. The defendants, therefore, could not have been taken by surprise by the amendment, and would not be deprived of the benefit of any defence or put to any disadvantage on account thereof.

The action of the Circuit Court in permitting these amendments we think is justified by the rules on that subject as

stated by this court in the case of *Neale* v. *Neales,* 9 Wall. 1; in *The Tremolo Patent,* 23 Wall. 518; and *Hardin* v. *Boyd,* 113 U. S. 756, 761. In the last mentioned case it was said (p. 761): "In reference to amendments of equity pleadings the courts have found it impracticable to lay down a rule that would govern all cases. Their allowance must, at every stage of the cause, rest in the discretion of the court; and that discretion must depend largely on the special circumstances of each case. It may be said, generally, that, in passing upon applications to amend, the ends of justice should never be sacrificed to mere form, or by too rigid an adherence to technical rules of practice. Undoubtedly great caution should be exercised when the application comes after the litigation has continued for some time, or when the granting of it would cause serious inconvenience or expense to the opposite side. And an amendment should rarely, if ever, be permitted where it would materially change the very substance of the case made by the bill, and to which the parties have directed their proofs."

By the original national banking act, § 5151 Rev. Stat., it was declared that " the shareholders of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares." By § 5220, it was also provided that "Any association may go into liquidation and be closed by the vote of its shareholders owning two-thirds of its stock." But no provision is contained in the original act specifying what course may or shall be taken, in case of voluntary liquidation, to enforce the individual liability of the shareholders. It is provided by § 5234 that when the Comptroller of the Currency has become satisfied of the default of the association under §§ 5226 and 5227 to redeem any of its circulating notes, he may forthwith appoint a receiver, who, under his direction, shall take possession of the books, records, and assets of the association, collect all debts, dues, and claims belonging to it, "and may, if necessary to pay the debts of

such association, enforce the individual liability of the stock-holders. Such receiver shall pay over all money so made to the Treasurer of the United States, subject to the order of the Comptroller, and also make report to the Comptroller of all his acts and proceedings."

It thus appears that in the case of an involuntary liquidation under this section, the business of liquidation, as defined and required by the law, involved the appointment of the receiver, who should, in addition to the collection of the ordinary assets of the bank, also enforce against the stock-holders their individual liability, so far as necessary to create a fund sufficient to pay all the debts of the association. It can hardly be supposed that the omission in the statute to provide an express and specific course of proceeding, by way of judicial remedy, in case of voluntary liquidation, left the creditors of such an association in such circumstances without remedy against either a deficiency of assets or the results of a fraudulent maladministration. Section 5151 imposes upon the shareholders of every national banking association an in-dividual responsibility for all its contracts, debts, and engage-ments, and the terms in which the obligation is created are unconditional and unqualified, except that the liability shall be equal and ratable as among the shareholders.

As all the shareholders are bound in that way to all the creditors, any proceeding to enforce this liability must be such as from its nature would enable the court to ascertain for what the stockholders ought to be made liable, to whom, and in what proportion as respects each other. This can only be done by the methods and machinery of a court of equity. Besides this, it must, we think, be admitted that a court of equity would be entitled, upon the general principles of its jurisdiction, to entertain a bill by one or more creditors whose suit would necessarily be for the benefit of all, against the association and its officers and managers, and all those partici-pating in its voluntary liquidation, for the purpose of prevent-ing and redressing any maladministration or fraud against creditors, contemplated or executed. In the liquidation of such an association, those entrusted with its management

occupy the relation of trustees, first for creditors, and the terms of that trust, implied by law, require them to reduce the assets of the association to money or its equivalent, and to pay out those assets or their proceeds equally among creditors.

The omission in the original banking act of 1864 to provide expressly similar remedies in case of voluntary liquidation to those specified in case of involuntary liquidation was supplied by the act of June 30, 1876, 19 Stat. 63; Supplement to Rev. Stat. 216. The first section of that act provides for the appointment of a receiver by the Comptroller of the Currency, as provided in § 5234 of the Revised Statutes, whenever any national bank shall be dissolved and its charter forfeited as prescribed in § 5239 of the Revised Statutes, or whenever any creditor shall have obtained a judgment against it which has remained unpaid for the space of thirty days, or whenever the Comptroller shall become satisfied of its insolvency after due examination. This receiver, it is declared, shall proceed to close up such association and enforce the personal liability of the shareholders. Section 2 of the act of June 30, 1876, is as follows: "That when any national banking association shall have gone into liquidation, under the provisions of section five thousand two hundred and twenty of said statutes, the individual liability of the shareholders, provided for by section fifty-one hundred and fifty-one of said statutes, may be enforced by any creditor of such association by bill in equity, in the nature of a creditor's bill, brought by such creditor on behalf of himself and of all other creditors of the association, against the shareholders thereof, in any court of the United States having original jurisdiction in equity for the district in which such association may have been located or established." This section was in force when the first amended bill was filed in October, 1876. Whether we regard it as merely declaratory of the law as it stood under the original banking act, or as giving a new remedy which could not have been resorted to before, we think it warranted the court below in permitting the complainant to file his first amended bill.

In the case of involuntary liquidation under the supervision

of the Comptroller of the Currency, the receiver appointed by him is authorized and required, not only to collect and apply the proper assets of the bank to the payment of its debts, but also, so far as may be necessary, to enforce the individual liability of the shareholders. It thus appears that the enforcement of this liability is a part of the liquidation of the affairs of the bank; at least, so closely connected with it as to constitute but one continuous transaction. When, in the case of voluntary liquidation, the proceeding is instituted by one or more creditors for the benefit of all, by means of the jurisdiction of a court of equity, there seems to be no reason why the nature of the proceeding should be considered as changed. The intention of Congress evidently was to provide ample and effective remedies in all the specified cases for the protection of the public and the payment of creditors, by the application of the assets of the bank and the enforcement of the liability of the stockholders. Admitting that this liability is not strictly an asset of the bank, because it could not be enforced for its benefit as a corporation nor in its name, yet it is treated as a means of creating a fund to be applied with and in aid of the assets of the bank towards the satisfaction of its obligations. The two subjects of applying the assets of the bank and enforcing the liability of the stockholders, however otherwise distinct, are by the statute made connected parts of the whole series of transactions which constitute the liquidation of the affairs of the bank. It was, therefore, proper to describe the bill to be filed by and on behalf of creditors as in the nature of a creditors' bill so as to enlarge the scope and purpose of a bill that might be more strictly limited as a creditors' bill merely.

We think, therefore, that if such a bill would have been objectionable without the statute, it is warranted by the statute. It is no objection that the original bill was filed prior to the passage of the act of June 30, 1876. The bill as amended, being authorized by the statute in force at the time the amendment was filed, would justify such a proceeding in a pending suit to which it was made germane by the statute itself, as well as an original bill then for the first time

filed. Neither do we consider the objection valid that it does not purport to have been filed in pursuance of the act of June 30, 1876, and is not filed by the complainant on behalf of all the creditors. The scope and prayer of the bill under the operation of the statute made it a bill for the benefit of all the creditors, notwithstanding it erroneously claimed priority on behalf of the complainant individually. The only proper decree that could have been rendered upon it would have been for the equal distribution of the fruits of the litigation among all the creditors of the bank who in the meantime had come in and proved their claims. The final amendment, as we have already seen, only had the effect to make the bill conform to the course of the proceeding which had actually been had under it, and was, therefore, purely formal. Its only effect was to make the bill profess to be what in law it was, and what in point of fact it had been considered to be.

Mr. Daniell, Chancery Practice, c. 5, § 1, p. 245, 4th ed. says: "The court will generally at the hearing allow a bill, which has originally been filed by one individual of a numerous class in his own right, to be amended so as to make such individual sue on behalf of himself and the rest of the class."

Our conclusion on this point is, that the court below committed no error in permitting the amendments complained of to be made.

The assignment of error next to be considered arises upon the defence made on behalf of the defendants below, of the statute of limitations. The limitation relied upon is that prescribed by an act of Illinois, which provides that "actions on unwritten contracts, express or implied, or on awards of arbitration, or to recover damages for an injury to property, real or personal, or to recover the possession of personal property, or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within five years next after the cause of action accrued." Pub. Laws Ill. 1871–2, 559, § 15; Hurd's Rev. Stat. Ill. 1881, 705.

It is not necessary to decide in this case whether the statute of Illinois relied upon, is applicable, because in the view which

we have already taken of the nature of the amended bill filed in October, 1876, the statute, if applicable, ceased to run against the creditors of the bank entitled to the benefit of the decree, at that date. That amended bill is to be considered from the date of its filing, as a bill on behalf of all the creditors of the bank who should come in under it and prove their claims. When any creditor appeared during the progress of the cause to set up and establish his claim, it was necessary for him to prove that at the time of filing the bill he was a creditor of the bank; any defence which existed at that time to his claim, either to diminish or defeat it, might be interposed either before the master or on the hearing to the court. The creditor, having established his claim, became entitled to the benefit of the proceeding as virtually a party complainant from the beginning, and the time that had elapsed from the filing of the bill to the proof of his claim would not be counted as a part of the time relied on to bar the creditor's right to sue the stockholders. In other words, if he proves himself to be a creditor with a valid claim against the bank, he becomes a complainant by relation to the time of the filing of the bill. This being so, it is not disputed that in October, 1876, the bar of the statute had not taken effect, even on the supposition that the statute applied.

In the case of *In Re General Rolling Stock Company, Joint Stock Discount Company's Claim*, L. R. 7 Ch. 646, Mellish, L. J., stated that in a case where the assets of a debtor are to be divided amongst his creditors, whether in bankruptcy or in insolvency, or under a trust for creditors, or under a decree of the court of chancery in an administration suit, "the rule is that everybody who had a subsisting claim at the time of the adjudication, the insolvency, the creation of the trust for creditors, or the administration decree, as the case may be, is entitled to participate in the assets, and that the Statute of Limitations does not run against this claim, but as long as assets remain unadministered he is at liberty to come in and prove his claim, not disturbing any former dividend."

Mr. Daniell, 1 Chancery Practice, c. 15, par. 2, p. 643,

4th ed., states that "a decree for the payment of debts under a creditor's bill for the administration of assets is also considered as a trust for the benefit of creditors, and will in like manner prevent the statute from barring the demand of any creditor coming in under the decree; the creditor's demand, however, must not have been barred at the time when the suit was instituted: for if the creditor's demand would have been barred by the statute before the commencement of the bill the statute may be set up. It is to be remarked upon this point, that it has been held that it was the decree only which created the trust; and that the mere circumstance of the bill having been filed, although it might have been pending six years, would not take the case out of the statute; but, according to the later decisions, it seems that the filing of the bill will operate by itself to save the bar of the statute, though the plaintiff by delay in prosecuting the suit may disentitle himself to relief."

He also says, c. 29, par. 1, p. 1210: "It may be observed here that where a person, not a party to the suit, carries in a claim before the master under the decree, the party representing the estate out of which the claim is made has a right to the benefit of any defence which he could have made if a bill had been filed by the claimant in equity or an action had been brought at law to establish such claim. Therefore, as we have seen, an executor may in the master's office set up the Statute of Limitations as a bar to a claim by a creditor under the decree, provided such claim was within the operation of the statute before the decree was pronounced."

The authorities abundantly sustain the proposition also that a creditor who comes in under and takes the benefit of a decree is entitled to contest the validity of the claim of any other creditor, except that of the plaintiff whose claim is the foundation of the decree. 2 Daniell Ch. Pr. c. 29, § 1, p. 1210, n. *d* and cases cited.

In *Sterndale* v. *Hankinson*, 1 Simons, 393, decided in 1827, it was stated by Vice Chancellor Leach, that "every creditor has to a certain extent an inchoate interest in a suit instituted

by one on behalf of himself and the ·rest, and it would be attended with mischievous consequences to estates of deceased debtors if the court were to lay down a rule by which every creditor would be obliged either to file his bill or bring, his action."

It is supposed by counsel for the appellants that the authority of this case is shaken by what' was said by Jessel, M. R., in his decision of *In Re Greaves, deceased; Bray* v. *Tofield*, L. R. 18 Ch. Div. 551. It is true that in this case the Master of the Rolls said that creditors had better not rely upon that decision for the future, but he· points out as the reason that at the time he was speaking — in 1881 — bills in equity had been abolished in England, and that wherever it is an action to recover a debt upon a contract the statute of James was binding upon the High Court in every case in which it applies, and that it was no longer the practice, so far as· personal estate was concerned, to ·bring an action by one creditor on behalf of others, because of a provision in the act of 1852, since the passing of which the practice had been abandoned, of suing by one creditor on behalf of all, except in cases relating to real estate, as to which the section of the statute does not apply, unless it has been ordered to be sold or there is a trust or power of sale, and that, therefore, there were no longer any suits brought by any creditor, except for the payment of his own debt. In the present case, the suit, although in the nature of a creditor's bill, is not a bill merely for the administration of the assets of an insolvent corporation. There is no fund formerly belonging to the corporation in court for distribution. It is a suit for the enforcement of a personal liability of the defendant stockholders to pay the debts of the corporation, in which the creditors are the complainants. Each creditor becomes a party to the suit, it is true, only when he appears to prove his claim. His right to proceed depends upon the fact of his being the owner of a valid claim against the corporation; but if he proves such a claim, then he does prove himself to be a creditor, and as such is entitled to come in under the decree, and has a right to be considered

as a party complainant from the beginning by relation to the time of filing the bill. The beginning of the suit as between the creditor and the stockholder is the date of the filing of the bill, if during its progress and pendency he proves his right to be considered as a cocomplainant. It follows, therefore, that the statute sought to be applied in the present case ceased to run as against the complainants from the date when the bill was filed, in October, 1876, under which they subsequently established their right to come in as participants in the benefits of the decree. Whether or not the Statute of Limitations of Illinois would in any case operate to bar such a suit as the present, being a bill in equity in the Circuit Court of the United States, founded upon an obligation arising under an act of Congress, is a question which we are, therefore, not called upon to consider or decide.

Another assignment of error is peculiar to the appeal of the administrator *de bonis non* of William H. Adams, deceased. William H. Adams in his lifetime was one of the defendants in the amended bill of 1876, and at the time of the suspension of the bank a stockholder to the extent of 240 shares. He died June 6, 1882, during the pendency of the suit, which stands revived as against his administrator *de bonis non.* The administrator contended that the personal liability of his intestate did not survive as against the administrator, and that, therefore, no decree could be rendered against him subjecting the estate of Adams in his hands for administration. The judicial decisions more directly relied upon by the appellant in support of this contention are those of *Dane* v. *Dane Manufacturing Co.,* 14 Gray, 488; *Bacon* v. *Pomeroy,* 104 Mass. 577; *Ripley* v. *Sampson,* 10 Pick. 371; *Bangs* v. *Lincoln,* 10 Gray, 600; *Gray* v. *Coffin,* 9 Cush. (Mass.) 192. These cases, however, so far as they are in point, are based upon the particular language of the statutes of Massachusetts, materially differing from that contained in the national banking act. Under that act the individual liability of the stockholders is an essential element in the contract by which the stockholders became members of the corporation. It is volun-

tarily entered into by subscribing for and accepting shares of stock. Its obligation becomes a part of every contract, debt, and engagement of the bank itself, as much so as if they were made directly by the stockholder instead of by the corporation. There is nothing in the statute to indicate that the obligation arising upon these undertakings and promises should not have the same force and effect, and be as binding in all respects, as any other contracts of the individual stockholder. We hold, therefore, that the obligation of the stockholder survives as against his personal representatives. *Flash* v. *Conn.*, 109 U. S. 371; *Hobart* v. *Johnson*, 19 Blatchford, 359. In Massachusetts it was held, in *Grew* v. *Breed*, 10 Met. 569, that administrators of deceased stockholders were chargeable in equity, as for other debts of their intestate, in their representative capacity.

The next assignment of error to be considered arises upon the separate appeal of Charles Comstock, who is charged by the decree with an assessment upon 150 shares of the capital stock of the bank standing in his name as owner at the time of its suspension. In his answer, which is under oath as called for, Comstock "admits that at the time of the said suspension he was the owner and holder of certain shares of capital stock thereof; that previous to — about in the year 1872 — he was the owner of one hundred and fifty shares of said stock; that on or about the 8th day of February, 1873, this defendant sold, assigned, and delivered fifty shares of the said stock to Ira Holmes, and on or about June, 1873, this defendant sold, assigned, and delivered fifty other shares of said stock to Preston C. Maynard; that he endeavored repeatedly to have said stock transferred on the books of the bank, but that said Maynard refused to allow said stock — so transferred, although he had before promised to have the same transferred. That at the time of the said several sales of stock as aforesaid, the said banking association was carrying on its regular business of banking, and was in fact solvent and fully able to pay its debts, and, as he is informed and believes, not indebted to any of the present creditors of said bank. That afterwards, on or about the 23d day of September, 1873,

this defendant sold, assigned, and delivered to the said Ira Holmes his other fifty shares of stock in said bank, with other property, receiving in payment therefor, and for the other property sold to said Holmes at the same time, certain promissory notes of one Wm. Patrick, payable to the said Ira Holmes, and was secured with certain other notes by mortgage from said Wm. Patrick to said Ira Holmes, which said notes and mortgage have proven to be of little value to this defendant, and in consequence of the incumbrances and taxes upon said property, and the expense of foreclosing, and how much of the value of said notes and security should be attributable to the consideration of this sale of said stock, this defendant is unable to state; but he insists that at the time of said sale to said Holmes this defendant was informed and believed said bank was able to pay all its debts in full, and the consideration received by him was paid by said Holmes out of his individual property, and not from the assets or property of said bank."

The stock books introduced on the part of the complainant show that fifty shares of this stock were transferred September 23, 1873; fifty more on September 24, 1873, and fifty more were cancelled on the last date; and the testimony of Holmes is that, as to the last fifty shares, they must have been transferred at the same time. The transfers in each case were to Ira Holmes. It is found by the decree of July 23, 1883, that the bank became insolvent and suspended payment September 23, 1873, and went into voluntary liquidation on September 26, 1873. The resolutions of the shareholders of the bank, instructing the directors to put the bank into voluntary liquidation, were passed at a meeting held on September 25, 1873. One of the resolutions is as follows: " That this bank, in its endeavors to continue business through the existing panic, has substantially exhausted its cash resources and is unable to continue cash payments, and that we regard it for the best interests of the stockholders and depositors alike that its affairs be placed in voluntary liquidation in accordance with the 42d section of the national currency act in that behalf provided." The directors, at a meet-

ing held on the same day, resolved to go into voluntary liquidation and close up the affairs of the bank in pursuance of this resolution. The notice to the public, addressed to the creditors of the bank, was issued and advertised the next day. As to the fifty shares of stock sold by Comstock to Holmes on September 23, 1873, we think the conclusion cannot be resisted that the transaction was made in contemplation of the insolvency of the bank, and, although both parties may have believed that the bank would ultimately be able to pay all of its debts, notwithstanding this transaction, we think that, as against creditors, it was fraudulent in law, and to that extent Comstock is chargeable as a shareholder. The sale of fifty shares in February, 1873, and of the other fifty shares in June, 1873, there is no reason to suppose were not made in entire good faith, and without any expectation on the part of the parties of the insolvency of the bank. Notwithstanding that, Comstock continued to be upon the books of the bank the owner of these shares until September 23 and September 24, when they were respectively transferred.

By § 5139 of the Revised Statutes, those persons only have the rights and liabilities of stockholders who appear to be such as are registered on the books of the association, the stock being transferable only in that way. No person becomes a shareholder, subject to such liabilities and succeeding to such rights, except by such transfer; until such transfer the prior holder is the stockholder for all the purposes of the law. It follows, therefore, that Charles Comstock, in respect to the shares sold by him in February and June, 1873, was the statutory owner on the 23d day of September, 1873. His liability as such stockholder is the same as if he had that day sold and transferred the stock to Ira Holmes, but such a sale and transfer could only have been made that day by Comstock, who was himself a director, in contemplation and actual knowledge of the suspension of the bank; it would operate as a fraud on the creditors, an effect which the law will not permit. The case is not within the rule laid down in *Whitney* v. *Butler*, 118 U. S. 655. Here there is no proof, as there was in that case, of the delivery of the certificates to the bank

and a power of attorney authorizing its transfer, with a request to do so made at the time of the transaction. The delivery was to Holmes, not as president, but as vendee. We are, therefore, constrained to hold that the decree below, in charging Comstock with liability as the owner of 150 shares, was not erroneous.

The next assignment of error is based upon that part of the decree which directs payment of the claims reported by the master under the denomination of Class D, amounting in the aggregate to $185,119.34. They are designated by the master as claims " arising before the failure of the bank, upon which worthless collaterals were subsequently received." It is averred by the appellees that they are claims arising for the most part, if not in all instances, upon endorsements and guarantees made in the name of the bank by Holmes, its president, after the suspension of the bank, and while it was in liquidation. It appears clearly from the evidence that, in many cases, parties having claims against the bank accepted from Holmes commercial paper held by the bank which it had received in the course of its business, and which constituted a part of its assets, running some of it several months and some of it several years, bearing interest, some at the rate of eight and some at the rate of ten per cent. per annum, endorsed and guaranteed in the name of the bank by Holmes as president. The books of the bank show that in these cases the paper so received was charged against the account of the party receiving it, thus closing the account as settled. In these cases, it is testified by Holmes that the creditors gave their checks to the bank for the amount standing to their credit. In some cases, the creditors or their agents testifying to the transactions, without contradicting Holmes in respect to what was in fact done, nevertheless state that the paper accepted by them was received, not in payment, but as security. It is obvious, however, that in most, if not all instances, the witnesses are referring to the security which they supposed they had received and were entitled to rely upon, by means of the endorsement and guarantee of the paper thus received, made by Holmes as president in the name of the bank. They

certainly acted upon this belief, for in many instances they proceeded to obtain judgments against the bank, after the maturity and dishonor of the paper so received, upon these endorsements and guarantees, and in this proceeding proved their claims in that form by transcripts of such judgments. It is true that, in the final decree, the master was directed to correct his computation of interest so as to equalize the claims of the creditors by allowing interest at a uniform rate from the time of the suspension upon the amounts as they appeared to be due from the books of the bank, but all the claims in Class D, notwithstanding the settlements made, were included in the amounts found due and ordered to be paid. In this respect we are of the opinion that the decree is erroneous. Those creditors who made settlements after the bank was put into liquidation and received from the president in that settlement paper of the bank, or as in some cases the individual notes of Holmes himself, endorsed or guaranteed in the name of the bank, are not to be considered as creditors of the bank entitled to subject the stockholders to individual liability. The individual liability of the stockholders, as imposed by and expressed in the statute, is indeed for all the contracts, debts, and engagements of such association, but that must be restricted in its meaning to such contracts, debts, and engagements as have been duly contracted in the ordinary course of its business. That business ceased when the bank went into liquidation; after that there was no authority on the part of the officers of the bank to transact any business in the name of the bank so as to bind its shareholders, except that which is implied in the duty of liquidation, unless such authority had been expressly conferred by the shareholders. No such express authority appears in this case, and the power of the president or other officer of the bank to bind it by transactions after it was put into liquidation is that which results by implication from the duty to wind up and close its affairs. That duty consists in the collection and reduction to money of the assets of the bank, and the payment of creditors equally and ratably so far as the assets prove sufficient. Payments, of course, may be made in the bills receivable and

other assets of the bank in *specie,* and the title to such paper may be transferred by the president or cashier by an endorse-ment suitable to the purpose in the name of the bank, but such endorsement and use of the name of the bank is in liquidation and merely for the purpose of transferring title. It can have no other effect as against the shareholders by creating a new obligation. It does not constitute a liability, contract, or engagement of the bank for which they can be held to be individually responsible. Every creditor of the bank, receiving its assets under such circumstances, knows the fact of liquidation, and is chargeable with knowledge of its consequences; he takes the assets received at his own peril; he is dealing with officers of the bank only for the purpose of winding up its affairs. If he accepts something in lieu of an existing obligation looking to future payment it must be from other parties. It is not within the power of the officers of the bank, without express authority, by such means to prolong indefinitely an obligation on the part of the shareholders, which is imposed by the statute only as a means of securing the payment of debts by an insolvent bank when it is no longer able to continue business, and for the purpose of effectually winding up its affairs. This is the very meaning of the word "liquidation." Mr. Justice Story said, in *Fleckner* v. *Bank of the United States,* 8 Wheat. 338, 362 : "Its ordinary sense, as given by lexicographers, is to clear away, to, lessen debt, and, in common parlance, especially among merchants, to liquidate the balance is to pay it." In *White* v. *Knox,* 111 U. S. 784, 787, it was said : "The business of the bank must stop when insolvency is declared." In *National Bank* v. *Insurance Co.,* 104 U. S. 54, the liquidation of such an association was said to be like that which follows the dissolution of a copartnership.

In this view, it is contended, on behalf of the creditors interested, that, as they relied upon the continuing liability of the bank and of its shareholders, by virtue of these endorsements and guarantees, if they are deprived of the benefit of the latter, the settlements themselves should be set aside, and they, the creditors, restored to the situation in which they

were at the time of the suspension of the bank. But this is clearly inadmissible; such a restoration cannot in fact be made. The circumstances of the situation have greatly changed by the lapse of time. The creditors who entered into these settlements have no ground of complaint against the bank as a corporation or as against its stockholders; they were not misled to their hurt by any fraudulent misrepresentations or concealments of any matters of fact. Whatever mistake was made was their own, and it was a mistake consisting merely in a misapprehension of their legal rights. They were bound to know, as well as Holmes, the limits of his authority, and ought to have acted on the presumption that he had no right to bind the bank or its shareholders *in futuro* by any new engagement. If they chose, in their eagerness to obtain a settlement in advance of other creditors equally entitled, to accept a part of the assets of the bank or the personal obligation of its president in settlement of their claims, they must abide by the election which was then made, and which cannot now be set aside. They made their settlements in view of their own estimate of the present advantage; they cannot now undo them to the disadvantage of other creditors, over whom they sought to obtain preferences, nor to the prejudice of the stockholders, who have a right to be exonerated from the payment of all contracts, debts, and engagements of the bank contracted since the date of its suspension.

In respect to these claims in Class D, Ira Holmes, the president, testified as follows:

"Q. In each case where you settled with the creditor of the bank and turned him out bills receivable of the bank, how was that settlement — was it a payment, or what was the transaction? A. It was a full payment of the demand. He gave me his check on the bank for the amount, the same as if we were doing a regular business and the parties should come in and buy so much bills receivable and give me a check on another bank.

"Q. Was there any case in which there was any other understanding than that he took these bills receivable in payment of his demand against the bank? A. Not any."

On his cross-examination he is asked :

" Q. If creditors agree to take paper in full payment, why would the bank guarantee it? A. I didn't say they agreed to take it in full; a great many people took the paper without guarantee, and others would not take it unless they had a guarantee; only when it got down to the last settlement, and they would not take it unless the bank would guarantee it."

The force of this testimony is, we think, that the party accepted the paper, with or without the guarantee, in settlement of the claim as it stood on the books of the bank on the day of the suspension. Those who insisted upon the guarantee or endorsement by the bank undoubtedly relied upon it as an obligation which they might thereafter enforce, but their reliance was upon that contract and not upon the original claim. It does not detract from the binding nature of the settlement that this guarantee was given and received and relied upon. The only mistake now asserted as a ground for going behind the settlement is, that the guarantee or endorsement is not effective as an obligation of the bank for which the stockholders are individually responsible. But this is not a mistake as to what the parties intended to do; it is only a mistake as to the effect of what they did. As the bank was in liquidation, and the officers were not authorized to enter into new contracts, the presumption is, in every case where the creditor accepted paper in settlement of his claim, that it was received in payment and operated as a satisfaction. If there was any other agreement by which that paper was received merely as collateral to the original debt and received as security and not in payment, it must be affirmatively shown.

We have carefully examined all the evidence contained in the record in respect to each of the claims embraced in Class D of the master's report. We are not able to find as to any one claim, that it is an exception from the general rule as to settlements established by the testimony of Holmes. In several instances, it is true that the witnesses with whom the settlements were made alleged that the notes with the endorsements or guarantees were not taken in payment and satisfaction, but as additional security for their claims; and that the

transactions were made upon the faith that the remedy against the bank and against its stockholders was not thereby impaired. But it is quite evident, we think, that in each of these cases the reliance was not upon the liability arising upon the claim as it stood prior to the settlement, but upon the endorsement or guaranty of the bank, and the belief that the liability of the stockholders remained unaffected by the transaction. The facts in each case are, that the claim as it stood upon the books of the bank was settled between the parties by the creditor accepting bills receivable out of the assets of the bank, or the individual note of its president endorsed or guaranteed in the name of the bank; supposing that, in the event of default in payment by the other parties to the paper, the obligation of the bank itself was preserved by the endorsement or guaranty, and that for that contract the stockholders continued to be liable. Upon this view of the facts, the stockholders are by law exonerated from the obligation to contribute to the payment of any claims of this class. All those enumerated in Class D in the master's report, therefore, should have been excluded from the benefits of the decree.

Three other questions raised upon the record remain to be disposed of. The first is whether interest upon the debts of the bank should be allowed as against the stockholders from the date of the suspension. As the liability of the shareholder is for the contracts, debts, and engagements of the bank, we see no reason to deny to the creditor as against the shareholder the same right to recover interest which, according to the nature of the contract or debt, would exist as against the bank itself; of course, not in excess of the maximum liability as fixed by the statute. In the case of book accounts in favor of depositors, which was the nature of the claims in this case, interest would begin to accrue as against the bank from the date of its suspension. The act of going into liquidation dispenses with the necessity of any demand on the part of the creditors, and it follows that interest should be computed upon the amounts then due as against the shareholders to the time of payment.

The next question arises upon the objection of the appellants

to the allowance made by the decree of twenty per cent. of the amount of the debts of the bank due at the date of the suspension, in addition thereto, to cover the expenses of the receivership. This sum, we think, ought not to have been allowed. The ordinary costs of the cause are, of course, taxable as against the defendants as in other cases, but we see no reason why the stockholders should be required to contribute, as a debt due from the bank or themselves, to a fund for the payment of the expenses of the receivership. The receiver in this case was appointed under the original bill, before any claim was set up on behalf of the complainant and the other creditors against the stockholders upon their individual liability. The purpose for which the receiver was appointed was to collect the proper assets of the bank and reduce them to money, so that they might be applied to the payment of its creditors. This office he performed, and the fund so realized may be and was properly charged with the expenses of its collection, but the receiver was not necessary to the enforcement of the liability of the stockholders in this suit. That liability was in progress of enforcement by the creditors themselves. Nothing was necessary to that end except the ordinary procedure by means of a master to ascertain what amount of debts was due, to what creditors, with the names of the stockholders who were such on the books of the bank at the date of its suspension, and the number of shares held by each. The case differs in this respect from that of an involuntary liquidation under the supervision of the Comptroller of the Currency. The receiver appointed by him is the only person authorized to enforce the liability of the stockholders, as well as to collect and distribute the assets of the bank; everything to be done must be done by and through him, and in his name; he is the only person charged with all the active duties and responsibilities of the liquidation of the bank, including the enforcement of the individual liability of the stockholders. The fund realized for distribution must, of course, include the costs and expenses necessarily incurred by him in the performance of these statutory duties. The equivalent for them, in the case of creditors who upon the voluntary liquidation of the bank seek to enforce

the individual liability of the stockholders, is the ordinary costs of the court taxable in the cause. No receiver is necessary in ordinary cases, and there is nothing in the circumstances of this case to make it an exception. Whatever costs and expenses should be paid on account of the receivership in this case, beyond any allowance made heretofore and paid, if any, should come out of the creditors at whose instance the receiver was appointed, and not out of the stockholders.

It is also objected to the decree that it included among the claims directed to be paid out of the assessment upon the shareholders an amount, alleged to be about $5000, in behalf of persons assumed to be creditors, but who did not appear in the cause or before the master to file and prove their claims. This was erroneous. No person is entitled to recover as a creditor who does not come forward to present his claim. The only proof in reference to such claims in the present case consisted in affidavits made by Henry B. Mason, one of the attorneys of the receiver, that he had "made a personal investigation of all the claims against the Manufacturers' National Bank, and, from the evidence introduced in the cause, and from outside knowledge confirmatory thereof, states that the Manufacturers' National Bank of Chicago is justly indebted to the several persons mentioned in the schedule hereunto annexed and made part of this affidavit, in the principal sums set opposite their several names, with interest thereon from March 12, 1875, at the rate of six per cent. per annum in each case," &c. No one appeared as claimant, and no authority is shown to any one to act for him or in his own name. These claims should have been disallowed.

*The decree of the Circuit Court is accordingly reversed, and the cause is remanded, with directions to proceed therein as justice and equity may require, in conformity with this opinion; and it is so ordered.*