Leo Fox et al., Appellees, v. Produce Cold Storage Exchange et al., on appeal of Ernest V. Johnson.

Gen. No. 19,274.

Same v. Produce Cold Storage Exchange et al., on appeal of Daniel F. Crilly.

Gen. No. 19,275.

Same v. Produce Cold Storage Exchange et al., on appeal of Susan L. Markley and Frances E. Baker, Executors.

Gen. No. 19,276.

1. CORPORATIONS, § 104*—*when prospectus binding agreement.* Prospectus of a new corporation to be formed stating the terms and conditions upon which the stock was to be issued and signed by the subscribers to the stock, *held* a binding agreement.

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

2. Corporations, § 213*—*when transaction construed as intended to give stock appearance of having been fully paid.* In an action to enforce the individual liability of stockholders, evidence *held* to show that the formation of a corporation, the subscription of all but sixteen shares of its stock by a certain person with a bonus of one share of common stock for every share of preferred stock subscribed for, and the transfer to the corporation of all the property and assets of an insolvent corporation was a mere colorable transaction for the purpose of giving the stock so subscribed for the appearance of being fully paid, the object being to secure additional capital for the latter corporation, after it had vainly endeavored by other means to secure it, the person so subscribing for the bulk of the stock being a mere go-between, and the actual subscribers being fully cognizant of the character of the transaction.

3. Corporations, § 213*—*when value of property given in exchange for stock insufficient.* In an action to enforce the individual liability of stockholders in an insolvent corporation, who had paid but fifty per cent. of the par value of the stock in cash, and who claimed that the value of the property and assets of another corporation turned over to the corporation in which they were stockholders more than equaled the entire par value of the stock issued, and hence that the stock held by them was fully paid and nonassessable, evidence *held* to show that the value of such property was less than a third of the alleged value.

4. Corporations, § 213*—*when good will of corporation of no value in payment for stock.* The good will of a corporation transferred to another corporation in part payment of its capital stock will not be considered as of any value in a proceeding to enforce the individual liability of stockholders in the latter corporation, where at the time of such transfer the former corporation was in desperate financial straits, its operating expenses having exceeded its income, and its directors having determined upon a dissolution.

5. Corporations, § 213*—*when leasehold of no value in payment of stock.* In an action to enforce the individual liability of stockholders in an insolvent corporation, in determining whether certain property turned over to the corporation was of sufficient value to render the stock fully paid, a leasehold, assigned to the corporation, the terms of which were so onerous in character as to constitute a serious obstacle in procuring financial aid, will be considered a liability and not an asset.

6. Corporations, § 219*—*when evidence shows notice that stock was not fully paid.* In an action to enforce the individual liability of stockholders in an insolvent corporation, who were inti-

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

mately connected with it and with another corporation to whose property and rights it succeeded in pursuance of a reorganization scheme evolved to procure additional capital for the latter, the evidence was *held* to show that the defendants had knowledge that the stock was not fully paid.

7. CORPORATIONS, § 219*—*when purchase of stock at less than par places purchaser on notice.* The purchase of stock in a corporation at fifty per cent. of its par value places the subscriber on notice as to whether the stock was actually fully paid and nonassessable.

8. CORPORATIONS, § 232*—*when decree in action to enforce stockholders' liability conforms to bill.* Decree in an action to enforce the individual liability of stockholders in an insolvent corporation *held* to conform to the allegations of the amended bill.

9. CORPORATIONS, § 232*—*when decree enforcing stockholders' liability will not be set aside.* A decree pro rating the liability of stockholders in an insolvent corporation upon a basis of the difference between the amount actually paid in on the stock issued and the par value thereof will not be set aside on the ground that it should have been based upon the difference between the value of certain property turned over to the corporation, together with the cash received upon the stock subscriptions and the par value of the stock, where the court below in determining the value of such property had failed to deduct a liability, which would have rendered the net amount of stock unpaid the same on either basis.

10. CORPORATIONS, § 233*—*who are creditors within bill filed in behalf of all creditors.* The holder of corporate bonds made a creditor by the bonds themselves and by the decree of foreclosure entered thereon is within the protection of a bill filed under R. S. ch. 32, sec. 25 (J. & A. ¶ 2442), in behalf of the complainant and all other creditors.

11. CORPORATIONS, § 235*—*when suit to enforce stockholders' liability tolls statute of limitations.* A bill filed on behalf of the complainants and all other creditors of the defendant corporation against the corporation, and also against the stockholders of such corporation to enforce the individual liability of the stockholders, will prevent the statute of limitations from running against any of the creditors who came in under the decree.

12. EQUITY, § 440*—*when re-reference properly denied.* Where in an action to enforce the individual liability of stockholders, the master entered a rule upon defendants to close proof within thirty days on a certain claim, and they requested the master to report to the court recommending the disallowance of the claim upon the evidence already taken in the case and on objections filed to the claim, and the master recommended the disallowance of the claim

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

on the ground that it was barred by the statute of limitations, and defendants took no further steps for a re-reference for hearing on the merits, being content to rely upon the master's ruling upon a question of law in their favor until the court was about to enter a decree after having intimated that the exceptions to the master's report would be sustained, the refusal of a re-reference for the introduction of evidence on the merits was within the discretion of the court.

13. Corporations, § 231*—*what evidence admissible in action to enforce stockholders' liability.* In an action to enforce the individual liability of stockholders to the extent of their unpaid stock holdings, where the evidence showed that the corporation was in fact a reorganization of an insolvent corporation, the books and papers of the latter are properly admitted in evidence.

Appeal from the Circuit Court of Cook county; the Hon. Jesse A. Baldwin, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1913. Affirmed. Opinion filed April 22, 1915.

**Statement by the Court.** This is a bill in chancery filed by Leo Fox, Ellis Kaufman and Joseph B. Langworthy, appellees, hereinafter referred to as the complainants, against the Produce Cold Storage Exchange, a corporation, and all of its stockholders, under section 25, chapter 32 of our Revised Stautes, relating to corporations (J. & A. ¶ 2442), to procure payment of certain money decrees recovered against the said corporation, in the respective sums of $3,165.85, $22,160.85 and $633.17.

During the pendency of the proceedings, Frank Hall was permitted to intervene with a claim amounting with interest to $406,248.50.

Upon hearing, a decree was entered assessing the stockholders in amounts sufficient to pay the claims of the complainants and Frank Hall. From that decree Ernest V. Johnson, Daniel F. Crilly and the executors of John A. Markley, deceased, hereinafter referred to as the defendants, severally perfected appeals to this court; such appeals being general numbers 19,274,

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

19,275 and 19,276. An order was entered by this court consolidating same for hearing on a joint record, abstract and brief.

The record shows the frequent use of the names Produce Cold Storage Exchange, one of the defendants, and also another corporation known as the Chicago Cold Storage Exchange; and for convenience they will hereinafter be designated as Produce Exchange and Chicago Exchange respectively.

The amended bill of complaint on which these proceedings were had was filed April 14, 1897. After naming the defendants, it states that it is brought on behalf of the complainants jointly and severally, and on behalf of all other creditors of the said Produce Cold Storage Exchange. The bill alleged that the Produce Exchange was a fully organized corporation on February 2, 1892, with a capital stock of $1,000,000, divided into 10,000 shares of the par value of $100 each; that the several complainants obtained decrees against the defendant corporation upon which execution was issued and returned no part satisfied; that said corporation on or about October 7, 1895, ceased doing business, leaving debts to the extent of $40,000 unpaid, and has not since transacted or carried on any business or paid said debts or any part thereof; that on the eighth day of May, 1894, the First National Bank of Manning, Iowa, recovered judgment in the Circuit Court of Cook county against the said Produce Exchange for $6,864.16; that an execution was issued thereon and payment demanded; that said execution was permitted to remain unsatisfied from that time until the filing of the bill. The bill then sets forth the subscription to the capital stock of the said corporation by eight men who were subsequently elected directors, for two shares each, which, under a resolution passed, was to be issued fully paid up, in consideration of services performed on behalf of the corporation by these eight directors. The bill alleges, however, that

the resolution was colorable and collusive to make it appear that said stock issued to the directors mentioned was fully paid up, when in fact it never was or never had been; that the said directors in a meeting held February 2, 1892, adopted a resolution by which they determined to issue one-half of the entire capital stock of the said Produce Exchange as preferred stock on which dividends were to be paid at the rate of seven per cent. per annum, payable semiannually, before any dividends were to be paid on the remainder of the said capital stock; which remainder was directed to be issued as common stock.

The bill then further alleges that there was issued and delivered to W. D. Morton, Jr., certificates for 9,984 shares, one-half preferred and one-half common, all of which were transferred and delivered by him, and that of such stock 100 shares of preferred and common stock was issued to the said Ernest V. Johnson; that 100 of each were issued to the said John A. Markley; and 25 shares of each to the said Daniel F. Crilly; all of whom are appellants herein. The bill further alleges that the said 9,984 shares issued to the said Morton, and by him transferred and delivered as aforesaid, were not and never had been paid for to the said Produce Exchange; that in fact it did not receive from said Morton or anyone else property or money sufficient to pay for said stock; that the said stock was wholly unpaid, and the said present and past holders thereof are severally and jointly liable thereon to complainants and other creditors of the said Produce Exchange; that the directors fraudulently accepted, on February 6, 1892, certain funds and property and declared same to constitute full payment of the stock; that the property in question consisted of a leasehold, a new warehouse building, certain foundation work, paid services of architects, $47,120 on deposit in New York, certain licenses, patent rights,

accounts due and payable, machinery—all of the former belonging to the Chicago Exchange—and $161,700 in cash. The bill further alleges that this said property of the Chicago Exchange did not exceed in value the sum of $300,000; that the said directors fraudulently, wrongfully and improperly, and merely for the purpose of making the stock appear fully paid, pretended to value the said property and funds at $998,400, and accepted same in full payment of the said stock, although they well knew they were grossly overvaluing said property; that said transaction was fictitious, colorable and collusive, not bona fide, but entered into and made by and with said Morton at the request of and on behalf of all the stockholders, so that it might be made to appear that the stock of said Produce Exchange was fully paid, while same was in fact not fully paid. The bill further alleges that all past and present holders of said stock took same with full notice and knowledge that same had been wrongfully declared fully paid by the overvaluation of said property; that by reason of such fraudulent overvaluation it was not fully paid, and that there now remains unpaid on same, to wit, $700,000, for which said holders of stock are liable under the statute in such case made and provided; that the debts of the said Produce Exchange greatly exceeded the assets, that it was insolvent, and recourse to the liability of the stockholders is and will be necessary to pay debts; that a receiver be appointed to conserve its property, records and books; that the affairs of the said Produce Exchange be closed and wound up and said corporation be dissolved as is by statute provided. The bill prays for answer not under oath and asks that an account be taken of the amount due and owing to complainants, a receiver be appointed to do all things necessary to close and wind up the affairs of the said Produce Exchange, and said Produce Exchange be dissolved, and that the business be closed

up and that complainants and all other creditors may have such other and further relief in the premises as to equity shall appertain, etc.

To this amended bill appellants and other defendants filed answer on June 18, 1897. We adopt here the characterization of the answer as set forth by appellees in their briefs, namely, that said answer "denied all the material allegations in the bill with reference to the alleged overvaluation of said property, with reference to notice and knowledge of such overvaluation by defendants, and the liability of any of them;" and further, that "defendants purchased the stock on representations made and relied upon by them, that it was fully paid and non-assessable, and purchased same in good faith, believing same fully paid and non-assessable, as the certificates issued to them represented such stock to be; and if said Produce Exchange incurred any indebtedness to said complainants, said complainants, before incurring same, had full notice and knowledge of the manner in which said stock had been paid for by Morton."

A general replication was filed to said answer January 24, 1898.

On February 18, 1898, the cause was referred to Wm. Fenimore Cooper, master in chancery, to take evidence upon the issues and report conclusions of law and fact. Hearing before the master commenced June 26, 1899.

On February 13, 1903, the Union Trust Company was appointed receiver of all the assets of the Produce Exchange. On December 24, 1903, and on January 27, 1904, the Western Cold Storage Company and the First National Bank of Chicago, respectively, filed intervening petitions in said cause, setting forth that they held a certain number of bonds for $1,000 each issued by the Produce Exchange April 1, 1894, which were unpaid, and prayed that they be made parties

complainant in the case. On May 27, 1904, the court entered an order that leave be given the First National Bank of Chicago and the Western Cold Storage Company to withdraw from the files and dismiss said respective petitions, all without prejudice to all and every right of said First National Bank and said Western Cold Storage Company, to file, present and prosecute the respective claims alleged in said respective petitions under this order, or otherwise prosecute same.

It was further ordered that the receiver publish notice for three weeks that any persons having claims against the Produce Exchange should, within thirty days, file with said receiver their petitions or statements verified, setting forth such claim; also to give notice that all parties in interest will be allowed ten days after the expiration of said thirty days to file objection to any claim so filed, and unless objected to, such claim will be allowed and the claimant admitted as a co-complainant in said cause; also, any person failing to file such claim within thirty days shall be barred from sharing in any of the assets of said Produce Exchange or in any funds subject to distribution in said cause.

The order further provided that any persons so filing claims, before they shall be entitled to be admitted as parties complainant, shall contribute their proportion of the costs and expenses incurred by the complainants up to the filing of such claims.

On July 26, 1904, the receiver filed a report showing that there had been filed with said receiver on July 23, 1904, pursuant to notice published by the receiver, the claim of Frank Hall. This report showed the notice published, and attached thereto was petition of said Hall setting out his claim.

This petition alleged that said Produce Exchange on April 1, 1894, issued a series of 300 bonds num-

bered from 1 to 300, secured by trust deed, with the American Trust & Savings Bank as trustee, upon certain property belonging to said Produce Exchange; that said Frank Hall is the holder and owner for value of 272 of said bonds, numbered 21 to 56, 58 to 84, 86 to 167, 170 to 174, 177 to 241, and 244 to 300, all inclusive. It recited the covenants in said trust deed and the provisions thereof; the foreclosure of the trust deed, including the decree of foreclosure, etc., and the amount claimed due the said claimant as holder of said bonds and coupons; and that said Frank Hall joins in all of the allegations set forth in the amended bill of complaint and prayer thereof, and offered to contribute his portion of the costs, etc., in consideration of which he prayed that order shall be entered making him a party complainant in this cause.

On August 2, 1904, certain of the defendants, including D. F. Crilly and John A. Markley, two of the appellants herein, filed objections to the claim of Frank Hall, pleading the statute of limitations against the claim; also that said claim is stale and that it would be inequitable to allow same as against the defendants.

On November 11, 1904, the claim and the objections thereto were referred to Wm. Fenimore Cooper, Esq., one of the masters in chancery in the Circuit Court, to take evidence thereon and report same, together with his conclusions of law and fact.

The taking of evidence on the first order of reference continued until July 2, 1903. It was then suspended until November 30, 1904, at which time notice was given that counsel would proceed with the taking of evidence on the bill and on the petition of Frank Hall.

On behalf of the claim of Frank Hall, there were offered in evidence the original Hall bonds, also the record of the foreclosure decree with reference thereto, and other documentary evidence.

Fox v. Produce Cold Storage Exchange, 192 Ill. App. 301.

On December 6, 1904, a rule was entered by the master on the defendants to close proof on the Hall claim within thirty days. On December 8, 1904, Mr. Wolseley, on behalf of the defendants, moved the master to report to the court recommending the disallowance of the claim of Frank Hall upon the evidence already taken in the case, and upon objections filed to said claim, which motion was set for hearing December 9th and argued before the master on January 12 to 14, 1905. A report on the said Hall claim was prepared by the master on March 29, 1906. In this report the master found certain facts, because of which he concluded that the claims and petition of Frank Hall were barred by the statute of limitations and should be adjudged against, and his petition to become a co-complainant be denied as to appellants and all other objecting defendants. The master, however, found the amount due on the Hall bonds, and as to the acquiescing defendants recommended that Hall be allowed to become a co-complainant.

To the report of March 29, 1906, no objections were filed before the master by the defendants. Objections were filed on behalf of the claimant Frank Hall, which objections, however, were overruled. This report was filed as a separate report by the master at the time the general report was filed on June 9, 1911.

An order of court was entered November 1, 1907, finding that John A. Markley died in April, 1907, and substituting Susan L. Markley and Fannie E. Baker as executors of John A. Markley, deceased, as defendants herein. They filed a joint and several answer setting forth that they were strangers to the matters and things alleged in said amended bill of complaint and called for strict proof of each and all of such allegations.

In his report on the main case, the master found for the complainants and against the appellants. He

found as a fact that the stock subscribed for by the appellants was not fully paid; that the property taken over in payment of the stock of the Chicago Exchange was at a valuation far in excess of the actual value thereof; that the appellants had notice thereof. He also found the respective amounts due from appellants on their stock subscriptions, and the amounts due the several complainants, and the amount for which each stockholder should be held liable on his stock. To save a re-reference and for the information of the court, he set forth the amount due on the Hall claim, in the event that the defendants should be held liable thereon, and indicated the amount each stockholder should be charged with; and reported as a conclusion of law that should the court sustain the petition of Frank Hall and overrule the defendants' plea of statute of limitations, a decree should be entered adjudging said stockholders liable for the payment thereof and a decree entered accordingly.

On September 25, 1911, it was ordered that the objections filed by Frank Hall to the report of the master should stand and be taken as exceptions to the said report and the cause be set for hearing on the master's report, and all exceptions then or thereafter to be filed. On October 3, 1911, it was ordered that objections theretofore filed on behalf of certain of the defendants to the claim of Frank Hall stand as exceptions, and that the objections of Ernest V. Johnson be entered *nunc pro tunc* as of August 2, 1904; that the master's report be amended so as to include Johnson as one of the defendants who filed objections to the Hall claim, and have the benefit of the master's findings of fact and conclusions of law in said report.

The objections of defendants, including the appellants, to the master's report on the general case having been overruled, exceptions were filed. The exceptions on both reports, viz., the Hall claim and on

the general case, were argued in July, 1912, and after the argument the matter was taken under advisement by the court. On December 2, 1912, the court announced that a decree should be prepared, overruling the exceptions of the defendants and sustaining the exceptions of Frank Hall to the said report of the master. Further consideration of said cause was continued until December 12, 1912, when the appellants and other defendants filed a motion for a re-reference on the Hall claim. On that day additional time was given to file a more detailed motion for re-reference, which was done on December 20th, This motion asked that there be a re-reference generally, with directions to the master to take such evidence as may be offered by the defendants, of any legal or equitable defense which any or either of them may have against said claim of Frank Hall. Said motion for re-reference was objected and demurred to by the complainants and Frank Hall, and upon a hearing it was denied.

On January 18, 1913, the court entered a final decree, wherein the master's report was found to be in all respects correct and should be affirmed, save in so far as the master finds, as a matter of law that the claim of Frank Hall was barred by the statute of limitations as to the appellants; and the complainants and the claimant were granted the relief prayed for in their bill of complaint and petition.

Various errors have been assigned which will sufficiently appear in the opinion.

HENRY W. WOLSELEY and JOHN T. RICHARDS, for appellants.

KRAUS, ALSCHULER & HOLDEN and SYDNEY STEIN, for appellees.

MR. JUSTICE PAM delivered the opinion of the court.

In determining the issues raised on this appeal, it is necessary to refer first to the corporation known as the Chicago Cold Storage Exchange. It was incorporated in 1890 for the purpose of doing a general cold storage business. It made a certain lease on certain real estate, dated May 2, 1890, by which lease it was bound not only to pay rent but also to improve the property. Afterwards, in accordance with the terms of said lease, it began to erect a new warehouse on the property. On September 14, 1891, it was desperately involved, largely in debt and in fact insolvent. On October 26, 1891, a committee of three was appointed by its directors to advise ways and means to save the company from ruin. George M. Moulton, its president, John P. Agnew and Adolph Loeb constituted the committee. Their efforts to secure additional working capital necessary to continue the life of the Chicago Exchange proved futile, and on November 7, 1891, at a special meeting the following resolution was adopted:

"Resolved, that unless the Committee on finance and ways and means, which is hereby continued in office, succeed, within ten days from this date, in raising by the subscription or sale of stock the necessary funds to continue the work of this corporation, the Board of Directors take the necessary steps to sell its entire assets for the best price the same will bring, and on the best terms they can obtain, and use the proceeds of said sale in paying the just and legal debts of the corporation, so far as the proceeds may reach, and that thereupon the Directors proceed to wind up the affairs of the corporation."

On November 18th this committee recommended the disposal of the assets of the Chicago Exchange in conformity with the foregoing resolution. On this same day there was read a letter from one Wm. D. Morton, Jr., written November 17th, submitting a proposition for the purchase of the assets of the Chicago Exchange. This letter was as follows:

"To the Board of Directors,
  Chicago Cold Storage Exchange,
    Chicago.
"Gentlemen:
  For and in consideration of all and singular the estate, property and equitable interest of which the Chicago Cold Storage Exchange is or may be at this date seized and possessed; and to which the said corporation is or may be at this date entitled, including moneys on deposit in Chicago and New York City, book accounts due, patent rights, leasehold, franchises, licenses, options and good will—meaning thereby, the entire, all and singular, of the assets at this date, of the aforesaid corporation, to be bargained, sold and properly transferred to me, or my assigns, as speedily in each instance as may be possible, prior to the first day of April, 1892, I, the undersigned, propose to pay to the said Chicago Cold Storage Exchange, the gross sum of $225,000.00 at such times and in such amounts as may be necessary, from time to time, to fully discharge and release the said Chicago Cold Storage Exchange, from its valid indebtedness to creditors at this date, to any amount not exceeding in the aggregate the gross sum hereinbefore named, as consideration for the proposed sale and transfer.

  "If this proposition is accepted by your board, I direct that all moneys now on hand or hereafter received by the Chicago Cold Storage Exchange, be paid for me to the American Trust & Savings Bank, at which also all claims against your company are to be paid out of the above purchase money, when such claims have been duly audited and approved by the president, treasurer and secretary of your company.
  "Dated Chicago, November 17, 1891.
                                    W. D. MORTON, JR."

This proposition was immediately accepted by the directors present at that meeting, over which George M. Moulton presided as president of the corporation. The acceptance was set forth in a letter dated November 20th, addressed to W. D. Morton, Jr., and signed

by the Chicago Cold Storage Exchange, by Geo. M.
Moulton, president. On the same date W. D. Morton,
Jr., wrote the following letter to the Chicago Ex-
change:

"Chicago, Ill., Nov. 20, 1891.
"Chicago Cold Storage Exchange,
    City.
"Gentlemen:

You are hereby authorized and instructed by me to
continue the cold storage business now in operation
in what is known as the old warehouse, under your
present management, for the benefit of my assigns,
transacting your banking business with the First Na-
tional Bank until such time as a new corporation can
be organized to carry on the business, and to be called
the Produce Cold Storage Exchange.

"When such corporation shall have been duly or-
ganized, and the indebtedness of your corporation
shall have been paid in accordance with 'my proposi-
tion to an amount not exceeding $225,000, you are
hereby authorized and directed to transfer all the as-
sets of your corporation to the said Produce Cold
Storage Exchange, which is to be organized.
                    Yours very truly,
                            W. D. MORTON, JR."

On the same date W. D. Morton, Jr., addressed the
following letter to the American Trust & Savings.
Bank:

"Chicago, Ill., Nov. 20, 1891.
"American Trust & Savings Bank,
    Chicago, Illinois.
"Gentlemen:

Having purchased the entire assets of the Chicago
Cold Storage Exchange, in consideration of payment
of indebtedness of said corporation to an amount not
exceeding $225,000, and it having been made condi-
tional to such purchase that the American Trust &
Savings Bank be the custodian of funds to be applied
to said purchase, and to disburse same upon the order

of the president, secretary and treasurer of the Chicago Cold Storage Exchange, to the creditors of the corporation, not exceeding in amount the gross sum of $225,000, I respectfully request that you act in the capacity of trustee for me and gentlemen associated with me, to the extent named above; that you receive such funds as my agents may pay in at your office for the purpose indicated herein, that you disburse the same to the creditors of this aforesaid Chicago Cold Storage Exchange, upon the order of its president, treasurer and secretary, to the necessary amount thereof, not exceeding $225,000, or until the said officers certify to me that the indebtedness of the said Chicago Cold Storage Exchange has been fully paid; and that the residue of funds then in your hands be paid to the order of the treasurer of the new corporation which is to be formed, and to be called the Produce Cold Storage Exchange.

Yours truly,

W. D. MORTON, JR."

At this time there was issued what purported to be a prospectus of the Produce Exchange, with a capital stock of $1,000,000. It is significantly headed:

## "ONLY FOR THE INFORMATION OF THOSE ALREADY FINANCIALLY INTERESTED OR THOSE WHO CONTEMPLATE INVESTING."

The following provisions of this prospectus are material: "This company is incorporated for the purpose,

"FIRST: Of acquiring ownership and possession of all and singular, all of the entire net assets, estate, property and equitable interests of the corporation heretofore existing and known as the Chicago Cold Storage Exchange, after the present indebtedness of the said corporation to a sum not in excess of $225,000, shall have been adjusted and fully paid. The assets referred to, comprise the following valuable property:

(Then follows a detailed description of all the property of the Chicago Exchange, to which reference in detail will be made later on.)

"SECOND: Of providing the necessary additional funds to immediately complete the fireproof warehouse hereinbefore referred to, so that the same may be operated for a cold storage business prior to May 1, 1892, requiring an estimated amount, in addition to the funds now on hand, of $215,000.

"THIRD: Of eventually extending the facilities for a general bonded and cold storage business so as to occupy the entire leasehold premises, or otherwise improve the same, in accordance with the terms of the lease, as future requirements of trade may seem to justify. In pursuance of this purpose the preliminary work has been accomplished by issuing $1,000,000 of 6 per cent. gold bonds maturing April 1, 1911, and payable at option of payer, April 1, 1901, by giving ninety days previous notice. These bonds will be acquired from the Chicago Cold Storage Exchange, having been unsold. It is proposed to retain the charter of the Chicago Cold Storage Exchange so that by proper guaranty these bonds may be rendered available for use of the Produce Cold Storage Exchange in constructing additional storage facilities which will insure increased revenues.

(Then follows a statement of the character of business that is expected to be pursued, and the estimated volume thereof.)

"To accomplish the purposes indicated in the foregoing prospectus will require $440,000 in cash to be raised by subscription, or which aproximately $225,000 will be required to discharge the present indebtedness of the Chicago Cold Storage Exchange and thus secure its property as hereinbefore enumerated. The remaining $215,000 added to the funds which will be acquired by term of purchase, will be sufficient to place the present partially completed fireproof warehouse in thorough working order, and make such changes in the present old warehouse as will furnish, by conservative estimate, 900,000 cubic feet of storage

space. Of this required amount of $440,000 there has been already virtually pledged by the stockholders and creditors of the Chicago Cold Storage Exchange, $265,000, leaving but $175,000 to be secured by new subscribers. A part of the conditions upon which the exceedingly advantageous terms of purchase of the assets of the Chicago Cold Storage Exchange were obtained, is that all of the present preferred stockholders of the corporation (being those who bought and paid for their stock in money to the company, which money was expended in the construction of the partially completed fireproof warehouse hereinbefore described) should have the option, within a reasonable time, of securing an equal amount of preferred stock in the Produce Cold Storage Exchange at $80 per share, or an amount of preferred stock equal to one-half or more of their present holdings, at $90 per share; also, that J. Ensign Fuller should receive 250 shares of preferred stock in the Produce Cold Storage Exchange as compensation for time and money expended, services rendered, licenses, etc., all of which inure largely in excess of the amount of compensation, to the benefit of the Produce Cold Storage Exchange. It *should be understood, as also provided in the conditions of subscription to the stock of the Produce Cold Storage Exchange, that a share of common stock will be issued to each person for every share of preferred stock to which such person is entitled at the formation of the company.*" (Italics ours.)

Then follows an estimate of the revenue and expenses and the estimated dividends that would be earned.

## "CONDITIONS OF SALE OF SEVEN PER CENT. CUMULATIVE PREFERRED SHARES OF THE STOCK OF THE PRODUCE COLD STORAGE EXCHANGE.

"This corporation shall have a total capitalization of $1,000,000 or 10,000 shares of a par value of $100 per share.

"Five thousand of the shares representing $500,000 par value, shall be preferred and cumulative to the extent of seven per cent. per annum, dividends to be paid semi-annually, and to accrue from and after May 1st, 1892, at rate named.

"The remaining 5,000 shares, representing $500,000 par value, shall be common stock, and participate pro rata in all the net earnings after accrued dividends upon the preferred stock shall have been paid.

"The entire stock, both preferred and common, shall be made fully paid and non-assessable, by the purchase of the entire net assets of the Chicago Cold Storage Exchange as described in the prospectus hereto annexed: the payment into the treasury of the Produce Cold Storage Exchange, of the residue of funds paid into the American Trusts & Savings Bank by subscribers to the preferred stock, after an amount not exceeding $225,000 shall have been expended to discharge the present indebtedness of the Chicago Cold Storage Exchange; and by the compensation to J. Ensign Fuller in stock for services, etc., as mentioned in the prospectus hereto annexed.

"The present preferred stockholders of the Chicago Cold Storage Exchange, shall have the option until December 10, 1891, of subscribing for an amount of stock in the Produce Cold Storage Exchange, equal to their present holdings of preferred stock in the Chicago Cold Storage Exchange, for which they shall be required to pay $80 per share—or of subscribing for an amount of stock in the Produce Cold Storage Exchange, which may be less than their present holdings, but equal to one-half thereof, of preferred stock in the Chicago Cold Storage Exchange, for which they will be required to pay $90 per share.

"Stock subscribed for by all other persons, and also stock subscribed for by preferred stockholders in the Chicago Cold Storage Exchange, which is in excess of their present holdings of preferred stock in the Chicago Cold Storage Exchange, shall be paid for at the rate of $100 per share.

"Every person entitled to receive shares of pre-

ferred stock of the Produce Cold Storage Exchange under the foregoing conditions, shall receive in addition to the number of shares of preferred stock to which such person may be entitled, a like number of shares of the common stock of the Produce Cold Storage Exchange, without further payment.

"The shares of stock, both preferred and common, to which each subscriber is entitled, will be evidenced by certificates issued and transferred to each subscriber when the full amount due thereon, as hereinabove provided, shall have been paid as follows:

"All payments for shares of stock, shall be made to the American Trust & Savings Bank of Chicago, as trustee, for the subscribers, until the corporation can be fully organized and settlement effected with the Chicago Cold Storage Exchange for transfer of assets of the latter corporation, to the Produce Cold Storage Exchange.

"Twenty per cent. of all subscriptions shall be paid at time of subscription.

"Twenty per cent. on or before thirty days after date of subscription.

"Twenty per cent. on or before sixty days after date of subscription.

"Twenty per cent. on or before ninety days after date of subscription.

"Twenty per cent. on or before four months after date of subscription.

"The American Trust & Savings Bank hereby agrees for a valuable consideration, which they acknowledge to have received, to pay to the order of the treasurer of the Produce Cold Storage Exchange, duly and at once, after the indebtedness of the Chicago Cold Storage Exchange has been paid to an amount not exceeding $225,000, or when the president, treasurer and secretary of said last named corporation shall have certified that the indebtedness of said last named corporation is fully paid, all the balance and residue of funds received from the subscribers to the stock of the Produce Cold Storage Exchange.

American Trust & Savings Bank,
by G. B. Shaw, Pres.

"We, the undersigned, each for himself, do hereby subscribe our names as purchasers of the preferred shares of the capital stock of the Produce Cold Storage Exchange, in accordance with the foregoing conditions, to the number of shares and amount set opposite our respective names, and we do hereby agree, in consideration of the premises, to pay the sum per share as required by the foregoing conditions, and at the times and place therein set forth."

This was not only a prospectus, but the very terms thereof and the signatures thereto constituted a binding agreement based on conditions set forth in the said prospectus.

Among the signatures affixed thereto appeared those of the Pioneer Fireproof Construction Company, by George M. Moulton, president, and John A. Markley.

On November 28, 1891, a license was issued by the State of Illinois to commissioners to open books of subscription to the capital stock of the Produce Exchange.

On December 31st notice was sent out by the commissioners that the capital stock of the Produce Exchange had been fully subscribed and a meeting was called for the eleventh day of January, 1892, for the purpose of electing a board of directors and for the transaction of any other business deemed necessary. The subscription to the stock was as follows:

| Names: | Shares: | Amount: |
| --- | --- | --- |
| George M. Moulton, | 2 | $200.00 |
| Jas. R. B. Van Cleave, | 2 | 200. |
| John McGillen, | 2 | 200. |
| Joseph Lathrop, | 2 | 200. |
| E. G. W. Rietz, | 2 | 200. |
| Louis J. Daegling, | 2 | 200. |
| W. D. Morton, Jr., | 9984 | 998,400. |
| Adolph Loeb, | 2 | 200. |
| Francis Lackner, | 2 | 200. |
| | 10,000 | 1,000,000.00 |

All these subscribers, with the exception of three, had been either directors or stockholders in the Chicago Exchange.

At this meeting of January 11th, it was declared that the entire stock had been subscribed for, and the nine men who had subscribed for the stock were elected directors.

A final certificate of incorporation was issued to the Produce Exchange on January 26, 1892.

On February 2nd, a special meeting of the directors of the Chicago Exchange was held, at which the president of said corporation, George M. Moulton, read a letter addressed to him as president of said Chicago Exchange, under date of January 30, from W. D. Morton, Jr. As a result of which at this meeting the executive officers of the Chicago Exchange by resolution were instructed to execute to the Produce Exchange an assignment of the ground lease and also to transfer to it all the property of the said Chicago Exchange.

On that same day a meeting of the directors of the Produce Exchange was held, at which by-laws were adopted and officers elected, Moulton being elected president. At this meeting it was directed that the capital stock be divided in two classes, preferred and common, at a par value of $100 per share; the preferred bearing dividends at the rate of seven per cent. per annum. It was also provided at the same meeting that the two shares of stock subscribed for by all other than Morton, one-half of which should be issued as preferred and one-half as common stock, be issued as fully paid, in recognition for services rendered in perfecting the organization.

On February 6th a special meeting of the board of directors of the Produce Exchange was held. The vacancy caused by the resignation of John McGillen was filled by the election of John P. Agnew.

At this meeting the president presented the draft of an agreement to be entered into between Morton and the Produce Exchange.

In this agreement it was stated that the Produce Exchange desired to possess certain valuable property in the possession of Morton, he having secured it by purchase from the Chicago Exchange; and that the said Morton had subscribed for 9,984 shares of the capital stock of the Produce Exchange, having a par value of $998,400; one-half of which stock was to be issued as preferred stock entitled to a seven per cent. annual dividend payable semi-annually, and that the remaining one-half be issued as common stock.

It was intended by this agreement that the said Morton pay for the 9,984 shares of stock by paying into the treasury of the Produce Exchange $436,700 in four instalments; one of forty per cent. on the twenty-seventh day of February, 1892, and three instalments of twenty per cent. each on the twenty-seventh days of March, April and May, 1892, respectively. That out of the said $436,700 so to be paid by the said Morton, the Produce Exchange should allow and cause to be paid the sum of $275,000 representing the debts of the Chicago Exchange; in consideration of which the property purchased by Morton from the Chicago Exchange would be transferred to the new company; leaving a net balance of $161,700 in the treasury.

The agreement then enumerates the property, details of which we shall have occasion to refer to later. That in consideration of the aforesaid, the Produce Exchange was to issue to the said Morton and his assigns, as fully paid up and nonassessable, certificates for such a number of shares from time to time as may be fully paid for to the par value thereof, by payments of money and the transfer of property in accordance with the purposes of the agreement.

By resolution, this contract was referred to a com-

mittee of three, with instructions to report upon the value of the property listed and described in said contract to be transferred to the Produce Exchange in full payment of the 9,984 shares of capital stock. The president thereupon appointed Adolph Loeb, C. S. Rietz and J. P. Agnew as such committee, and at the same meeting this committee submitted the following formal typewritten report:

·''Gentlemen:

"Your Committee appointed to appraise the value of the property and funds which Wm. D. Morton, Jr., proposes to bargain, sell, transfer and assign to this Corporation as equivalent in value, and in full payment for Nine Thousand Nine Hundred and Eighty-four (9984) shares of the capital stock of this company of the par value of $998,400, one-half of which shall be preferred, with dividend of 7% per annum, payable semi-annually, and cumulative after July 1, 1892, and the other one-half· to the common stock to participate in all net earnings of this company after dividends due the preferred stock have been paid— beg leave to report as follows:

"Of the property and funds set forth, described and enumerated in first, second and third sections of the contract which have been presented to the board of directors to be executed between W. D. Morton, Jr. and the Produce Cold Storage Exchange, the net amount of cash to be paid into the treasury of this company by the first and second sections will be One Hundred and Sixty-one Thousand Seven Hundred (161,700) dollars.                           $161,700.00

"In the third section various parcels of property are enumerated and described by paragraphs numbered from one to nine, which we appraise at a fair cash valuation, as follows:

1— "Leasehold, present worth, valuing ground 59,210 sq. ft. at $14 per sq, ft.,    262,940.

2— "New warehouse building west of west Water St., with bills paid thereon as provided by second section including building material on premises,    350,000.

3— "Foundation work finished east of West Water Street,    10,000.

4— "Architects' services paid for per contract and not yet utilized,    18,000.

5— "Leasehold interest in old warehouse,

6— "Cash available from deposits with the United States Trust Company of New York,    47,350.

7— "Licenses and patent rights,    10,000.

8— "Good will of cold and general storage business,    125,000.

9— "Book accounts, bills receivable, furniture, insurance, stationery, tools, and machinery, plans and specifications, agreements, franchises, etc.,    20,000.

|  | |
|---|---|
| Total, | 1,004,990.00 |

"Par value of stock to be issued in return for foregoing property,    998,400.

"Surplus of value in property to be transferred over value of stock,    6,590.00

"Your committee therefore recommend the acceptance and execution by this company of the proposed contract between it and W. D. Morton, Jr., and further that the president be authorized to appoint a committee, consisting of three reputable and qualified citizens of Chicago, to make a report, which shall be spread on the records of this company, upon the fair cash value, which in their judgment should be placed upon the several items of property and funds, which it is contemplated by this board of directors to accept

Fox v. Produce Cold Storage Exchange, 192 Ill. App. 301.

in full payment for 9,984 shares of the capital stock
of the Produce Cold Storage Exchange.

"Chicago, February 6th 1892.

E. G. W. RIETZ,⎫
ADOLPH LOEB,   ⎬   Committee."
JOHN P. AGNEW,⎭

In passing, it should be noted that one of the mem-
bers was appointed on this committee on the day he
was elected a director of the company. The report of
this committee was accepted and the executive officers
of the company authorized and directed to execute the
contract with Morton in the same terms in which it was
presented. At this meeting an assignment of the ground
lease from the Chicago Exchange to the Produce Ex-
change was presented, and upon a resolution the of-
ficers were instructed to accept same. At the same
meeting the president submitted a bill of sale running
from the Chicago Exchange to the Produce Exchange,
for the transfer of the goods, chattels and property of
the Chicago Exchange, which the executive officers of
the Produce Exchange were directed to accept; and
which property was also the subject-matter of the
contract entered into with W. D. Morton, Jr. At this
same meeting there was a resolution offered whereby
the president was authorized to procure from three
disinterested parties an appraisement of all property
transferred from the Chicago Exchange to the Prod-
uce Exchange by Morton, which appraisement was to
become part of the record. The committee appointed
consisted of Bruce B. Barney, J. R. Chapman and E.
V. Johnson. The report of this committee was sub-
mitted at a meeting of the board of directors on March
19, 1892.

The observation should be made at this time, that
this committee was appointed after the contract with
Morton had been accepted and in fact executed on
February 6th (the same date upon which this com-
mittee was appointed to report in the future), after

the assignment of the lease had been authorized, after the bill of sale had been concurred in and the entire transaction with reference to taking over the property of the Chicago Exchange and the issuance of 9,984 shares of stock to Morton had been approved. Further, J. R. Chapman was an officer of the American Trust & Savings Bank, trustee under the subscription agreement and also one of the creditors whose debts were authorized paid in the agreement with Morton. E. V. Johnson, another member, was a stockholder in the Chicago Exchange, an officer of the Pioneer Fireproof Construction Company, to whom the Chicago Exchange owed considerable money, which was paid under the arrangement with Morton, and this company also was a subscriber of stock in the new company.

It is contended by the complainants and the claimant that these facts, all of which were found by the master and set forth in his report and concerning which there was practically no dispute, together with the testimony of Morton and Moulton given before the master, clearly show that the offer of purchase by Morton and the acceptance thereof by the Chicago Exchange, the incorporation of the Produce Exchange and the issuance of the prospectus subscription agreement later, were all planned and done by order of Moulton, his associates, directors and stockholders in the Chicago Exchange, to effectuate a reorganization thereof, in order to save a loss to its stockholders and directors; furthermore, that Morton never had any real interest in either the Chicago or Produce Exchange, but was merely a dummy or go-between to act as intermediary in the transfer of the property from the Chicago to the Produce Exchange which was to be formed; that the prospectus agreement was issued for the purpose of securing additional capital which the defunct Chicago Exchange had made a vain endeavor

to obtain; that it offered as an inducement to secure such additional capital, one share of common stock as a bonus for subscription to one share of preferred stock; that that fact at once put all parties signing the subscription agreement upon notice that the stock was not fully paid; that the subscription to stock made to the commissioners authorized by the Secretary of State to open books of subscription and the subscriptions taken and reported by them were but an incident and step towards the carrying out of the prospectus subscription agreement; that the issuance of 9,984 shares of stock to Morton and the agreement by which it was issued as fully paid stock was but a scheme devised to make it appear that the stock of said company was fully paid and non-assessable. This contention was sustained by the findings of the master and his recommendations, and also by the court in its decree.

We are firmly of the opinion that both the master and the chancellor were warranted in sustaining that contention. A mere reading of the evidence of Morton at once establishes the fact that he had no personal interest whatever in the transaction, that he was employed by Moulton to facilitate the carrying out of the plan of reorganization. The evidence shows that every communication submitted to him, every act performed, every transfer of stock after it reached his hands, was by the direction of Moulton or his immediate associates.

The evidence further shows that the Chicago Exchange had appointed a committee to secure a loan of $250,000, and that this committee, of which Moulton was a member, reported that it could not be secured; furthermore, that a resolution was passed arranging for a sale of the assets and winding up of the affairs of the Chicago Exchange; that thereafter the committee was again instructed to secure a proposition to relieve the financial distress of the Chicago Exchange, and

this committee reported that it had met with failure and recommended steps be taken to wind up the affairs of the Chicago Exchange. At the very meeting held November 18, 1891, at which time this report was made, a letter dated November 17, 1891, written by Morton offering $225,000 for the property of the Chicago Exchange, was read by President Moulton and the proposition immediately accepted. Morton admitted on the witness stand that he signed this letter at the request of Moulton. Clearly a plan had been perfected to carry out the proposition set forth in that letter.

The letters of November 20th, passing between the Chicago Exchange and Morton, and the American Trust & Savings Bank and Morton, showed that Morton intended conveying the property to be purchased from the Chicago Exchange to the company to be organized and to be known as the Produce Exchange; and about this same time the prospectus subscription agreement was prepared for the purpose of securing subscriptions to the new company, and the American Trust & Savings Bank had already agreed to act as trustee, as provided for in said prospectus subscription agreement. The prospectus subscription agreement itself clearly showed that the formation of the Produce Exchange was to effectuate a reorganization of the Chicago Exchange. It recited that, all told, there was needed subscriptions to the extent of $440,000, of which $265,000 had already been subscribed by stockholders and creditors of the Chicago Exchange, requiring but $175,000 additional.

There can be no question that there was held out as an inducement for prospective subscribers a share of common stock free with every share of preferred stock subscribed for. Upon the completion of the incorporation of the Produce Exchange there had been subscribed $436,700. This, together with the common

stock given as a bonus, practically disposed of the capital stock of $1,000,000.

When the commissioners opened books of subscription for the Produce Exchange, instead of the stock being subscribed for by the subscribers to the prospectus subscription agreement, the record shows that 9,984 shares were subscribed for by Morton; the remaining 16 shares being divided equally among eight people who had been stockholders, creditors or directors of the Chicago Exchange, which under the resolution of the directors was voted them fully paid, for services in assisting in the reorganization. The agreement between Morton and the Produce Exchange involving the issuance to him of 9,984 shares fully paid and nonassessable has already been set forth. The $436,700 mentioned therein as consideration was not paid in by Morton nor had he ever any interest therein; it was the amount paid in by the subscribers to the prospectus subscription agreement. If the $436,700 had been the only consideration for the 9,984 shares, it is self-evident the stock was not fully paid. However, if the property of the Chicago Exchange turned over to the Produce Exchange could be estimated at a value sufficient that in addition to the cash turned over as a result of the subscriptions, it would have equaled the amount of the capital stock, then such stock might be considered fully paid. Consequently, at the same meeting at which this agreement for the issuance of the 9,984 shares of the stock was submitted, a committee was appointed to appraise said property. This committee made a formal report at the same meeting. We have no hesitancy in saying that this report was prepared in advance, and we have already remarked that one of the committee had been elected a director only that same day. All other papers necessary to effectuate this transfer had already been prepared and at this meeting were pre-

sented and immediately executed. In addition, there is the anomalous situation of appointing a citizens' committee to appraise the property *after the transaction had already been completed and fully carried into effect.*

The evidence further shows that these shares of stock were transferred by Morton, as directed by Moulton, to the subscribers to the prospectus subscription agreement.

We are firmly of the opinion that the issuance of the 9,984 shares of stock to Morton and the agreement pursuant to which it was issued as fully paid, the appointment of the appraisal committees, and their reports, were but an attempt to give to a fictitious valuation an appearance of reality; a subterfuge to conceal the real transaction and make it appear as if the stock were fully paid.

Appellants contend, however, that no matter what the means employed or the circumstances attendant upon the transfer of the property from the Chicago to the Produce Exchange were, if the value of that property together with the cash turned over as a result of the subscription agreement to the Produce Exchange was of the value of more than $1,000,000, then there can be no recovery in this case from the shareholders because the stock would thereby be fully paid and nonassessable. This contention brings into question the findings of the master with reference to the value of the property.

Appellants maintain that the valuation of the property by the committee appointed to report thereon at the time the 9,984 shares of stock were issued was correct, and introduced evidence to sustain that valuation. Complainants introduced testimony to the contrary. The master found that the evidence supported the appellants in but two instances, namely, with reference to the cash on deposit with the United States

Trust Company in New York, which was turned over to the Produce Exchange, $47,500, and the valuation placed upon the book accounts, $20,000. The valuation as to the new warehouse building, foundation work and architect's services, estimated by the committee at $378,000 was rejected by the master, who found the correct valuation to be $322,586.36. On these items he found as a fact that there had been an overvaluation of $55,413.64. The evidence on behalf of the appellants was general, while that of the complainants was specific. In fact, the master arrived at his conclusion by finding the value to be the actual cost of the buildings and the services, as evidenced by the amounts paid, the number of unpaid bills and the architect's service charges. We believe that the master was correct in basing his finding upon these figures and was warranted in estimating the value in this manner, under the facts and circumstances in evidence.

The license and patent rights which were valued by the committee at $10,000 he found as of no value. As we read the evidence, he was warranted in arriving at this conclusion from the facts and circumstances in evidence.

Upon the good will of the Chicago Exchange the committee placed a value of $125,000, which formed a part of the estimate which was the moving consideration in issuing the paid up stock to Morton. On this item the master found as follows:

"There is nothing in the record that justified a finding of any value for it, as the operating expenses of the business exceeded its income, by reason of which nothing was earned on the capital stock of the company, and as herein found, the company was threatened with financial collapse."

The master had also found that the Chicago Exchange was in desperate financial straits. In fact, as we have already stated, a resolution had been

passed to wind up the affairs of the corporation. We are satisfied that the finding of the master with reference to this item was correct and proper.

An important item included in the committee's report on values, was $262,940 for the leasehold. In the prospectus the value of this leasehold was placed at over $200,000. The evidence shows that the leasehold was at all times a serious obstacle in the path of the Chicago Exchange in securing financial aid. Under the terms of this lease the lessee was required to erect improvements on all the lots at a cost of not less than $1,200,000. The Chicago Exchange not only had failed to meet this provision, but, moreover, had failed to pay the rent due. In fact, the committee reported that by reason of the onerous conditions of the lease, an additional loan to finance could not be secured. Furthermore, evidence was heard upon the value of this lease; and from all the evidence in the case the master found that the leasehold when valued at $262,940 by the committee was not only overvalued to the full amount, but more than that, found that the lease was in fact a liability. Not only do we concur in that finding, but inasmuch as the master did not find the extent of the liability of this lease, we find as a fact from the evidence in the case that the liability upon this lease was at least $120,000.

The master further found that the committee's report as to the valuation of the property of the Chicago Exchange, upon which was based the action of the directors in issuing the 9,984 shares to Morton fully paid, was a ''cut and dried affair;'' that the appointment of the committee and the report was pursuant to a scheme for the promotion and organization of the said Produce Cold Storage Exchange. We believe this finding of the master is amply warranted by the evidence in the case and is one of the facts taken into consideration by us in arriving at the conclusion that

the master was correct in the finding as to the value of the property, the subject-matter of this committee's report.

The report of the citizens' committee, which the master characterized as a "pre-arranged cut and dried affair," and designated as evasive, was of no probative force on behalf of the contention of the appellants herein. That the directors could not have relied upon the report of the citizens' committee is further evidenced by the fact that the committee was not appointed until after the transaction had been consummated.

Appellants next contend that the evidence fails to show that they had any notice when they took the stock that it was unpaid. The master found, and the court sustained the master, that all of the appellants herein acquired the stock with notice that it was unpaid.

The record shows that Markley was a subscriber to the original prospectus subscription agreement, having signed it on January 22, 1892. The subscription agreement itself was notice to Markley that the stock was not fully paid, that he was receiving one share of common stock as a bonus with every share of preferred stock. The evidence clearly shows that he paid $10,000 for 100 shares of preferred stock, for which he also received 100 shares of common stock. He made his payments in accordance with the subscription agreement, received the script receipts, and finally received his stock certificates. His shares of stock were part of those issued to Morton fully paid and nonassessable.

The appellant Ernest V. Johnson was a stockholder in the Chicago Exchange. He was an officer of the Pioneer Fireproof Construction Company, which was a large creditor of the Chicago Exchange, and which also became a subscriber of stock in the new company

by signing the prospectus subscription agreement December 10, 1891. The Produce Exchange was a reorganization of the Chicago Exchange, in order to save the stockholders and creditors of the Chicago Exchange from loss. Johnson maintained that he received his stock as dividends on his stock in the Pioneer Fireproof Construction Company. Moulton was president of both the Chicago Exchange and the Produce Exchange, and also of the Pioneer Fireproof Construction Company. Moreover, Johnson comprised one of the citizens' committee appointed to appraise the property assigned, whose report the master characterized as a "cut and dried affair, pursuant to a plan to make the 9,984 shares of stock appear full paid and non-assessable." The shares of stock which Johnson obtained were part of those issued to Morton as fully paid and nonassessable. The evidence shows that Johnson received 100 shares of preferred and 100 shares of common stock through the Pioneer Fireproof Construction Company of which he was treasurer and general manager, as a dividend; that the amount actually paid up on said stock was $8,662.50, while the par value was $20,000.

Daniel F. Crilly claimed to have purchased his stock from Moulton and that he relied on Moulton's statement that the stock was fully paid and nonassessable. The evidence shows that he paid for his 50 shares of stock but fifty per cent. of the par value; that he did not pay Moulton for the stock but sent his payments to the American Trust & Savings Bank and received script receipts, which specifically referred to the prospectus subscription agreement, and that he received his stock certificates upon delivery of the said script receipts.

In fact, all of the appellants knew that a new company was being promoted or an old one reorganized; all were familiar with the prospectus subscription

agreement and were put on inquiry as to whether or not the purchase of stock at fifty per cent. on the dollar would secure to them stock fully paid and nonassessable. The master found that all of the appellants had notice that this stock was issued as fully paid when in fact it had not been and were liable under the complainants' bill and the petition of the claimant, and the court concurred therein; and under the facts and circumstances in evidence we believe such conclusion was warranted.

Appellants maintain that the decree and proof on which it is based do not correspond with the averments of the amended bill; and further, that the liability found in the decree is greater than that alleged in the bill.

The amended bill clearly alleges that the stock was in fact unpaid and that the Morton transaction was fictitious and a mere pretense which involved the proof with reference to the valuation of the property turned over to the Produce Exchange in payment of the stock issued to Morton. Under these allegations, the evidence, documentary and oral, as to the financial condition of the Chicago Exchange, the circumstances surrounding the Morton transaction, the value of the property of the Chicago Exchange, were all competent; and, in our opinion, the decree is not at variance with either the allegations or the proof.

The pro rata share of the liability of the appellants to the complainants and the claimant, was based on the finding by the master that the total amount unpaid on the stock was $566,084.16. This represents the difference between the amount actually paid on the stock issued and the par value thereof.

Appellants contend, however, that the total amount unpaid on stock should be the difference between the value of the property received by the Produce Exchange, together with the cash received on stock sub-

scriptions, and the par value of the said stock; that the value of the property, as found by the master, and the cash turned over by Morton amounted to $551,636.36, for which Morton received stock valued at $998,400, which would leave unpaid only $453,353.64 on said stock; that therefore on the basis of reckoning adopted by the master and the court, the defendants, including the appellants, were held liable for approximately $120,000 more than they should have been under the theory set forth in the bill. In arriving at this conclusion, the appellants are unmindful of the fact that while the master estimated the value of the property at $389,936.36, yet he also found that the lease, which was part of the property turned over, was a liability, but without stating the amount. We have, however, found the lease a liability to the extent of at least $120,000, thereby decreasing the value of the property by a like amount. Therefore, the stock would remain unpaid, on the application of the total net value of the property, to as large an extent as on the basis found by the court and master.

In view of our conclusion that the amount of the liability is the same whether measured by the difference between the amount actually paid and the par value of the stock, or by the difference between the actual value of the property and the par value of the stock, the contention that appellants' liability under the decree is greater than that alleged in the bill is without force.

Appellants further contend that the claim and petition of Frank Hall should have been denied and dismissed.

This bill was filed under section 25 of our Corporation Act (J. & A. ¶ 2442), and all the elements necessary to confer jurisdiction and obtain the relief provided for in that section were alleged and proved.

Appellants contend that the liability of the stock-

holders upon which complainants could recover in this bill under section 25 of the Corporation Act was created by section 8 of the same Act (J. & A. ¶ 2425), viz., a liability created by statute, to which section 15 of our Limitation Act (J. & A. ¶ 7210) applies, which provides that:

"Actions on unwritten contracts, express or implied * * * and *all civil actions not otherwise provided for,* shall be commenced within five years next after the cause of action accrued." (Italics ours.)

That said statutory liability was a "civil action not otherwise provided for," within the meaning of that language in section 15 *supra,* and that therefore an action to enforce the statutory stockholders' liability must be commenced within five years.

The amended bill upon which this case proceeded to trial was filed during 1897. On May 27, 1904, an order was entered whereby the receiver was directed to publish a notice for three weeks, requiring every person having claims against the Produce Exchange to file claims with said receiver thirty days from date of first publication; and all persons failing to file their claims within the time specified shall be barred from sharing in any of the assets of the said Produce Exchange; and that all parties in interest be allowed ten days after the expiration of said thirty days to file objections to claims so filed.

After publication of this notice the receiver reported that on July 23, 1904, Frank Hall had filed the claim and petition which has been heretofore set forth at considerable length.

On August 2, 1904, certain of the defendants, including Crilly and Markley, filed objections to the claim of Frank Hall, on the ground that it was barred by the statute of limitations. It is not denied that the allegations which were necessary to maintain this bill were of acts, all of which had taken place prior to Febru-

ary 16, 1897, the date of its filing. Appellants contend therefore that the right to recover for the liability of the stockholders on unpaid subscriptions to stock accrued not later than February 16, 1897, and that from that period on the statute of limitations began to run with reference to the right to recover from the stockholders on their liability as provided in section 8 of our Corporation Act, because such liability was covered by section 15 of our Limitation Act. If the appellants are correct in this contention, then the order entered May 27, 1904, *supra,* was without purpose and the claims of any one filed in pursuance thereof would have been barred by this contention.

As empowered under the statute, the bill prayed for a dissolution and winding up of the business of the Produce Exchange, appointment of a receiver, authority to sue in all courts and to do all things necessary in the closing up of its affairs. It was clearly an administration bill and it was expressly stated therein that it was brought on behalf not only of the complainants but of all creditors.

Surely, the holder of these bonds, upon which the Hall claim rested, was a creditor made so by the bonds themselves and the decree entered thereon December 22, 1896. There is no claim made that the rights of the complainants other than Hall were barred by the statute of limitations.

Claimant contends that the filing of this amended bill by the complainants on their own behalf and of all other creditors tolled the running of the statute of limitations as to the claim of this complainant and all other creditors of the company who thereafter made themselves parties; that the time that elapsed from the filing of the amended bill to his becoming a party thereto by filing his claim and petition cannot be considered as part of the time limited by the statute for the beginning of an action on his claim.

The appellants insist, however, that even though the bill was brought on behalf of all creditors, it was not sufficient to toll the statute of limitations; that only in the event that the decree entered upon said bill had been rendered within five years from the time the right of action accrued could any other creditors have availed themselves of the claim that their action was not barred by the statute of limitations by reason of the filing of the bill. This matter has been argued at great length in the briefs and many authorities submitted. A careful examination of these impels us firmly to the belief that the weight of authority is with the contention of the claimant Frank Hall.

In the case of *Sterndale v. Hankinson*, 1 Simon, 393, the vice-chancellor said:

"I entertain no doubt that every creditor has, after the filing of the bill, an inchoate interest in the suit to the extent of its being considered as a demand, and to prevent his being shut out because the plaintiff has not obtained a decree within the six years."

A well considered case is that of *Dunne v. Portland St. Ry. Co.*, 40 Ore. 295. In this case, along with other relief prayed for, the complainant sought to enforce the personal liability of stockholders. The bill was instituted on behalf of the complainants and all other creditors of the defendant corporation. The facts were very similar to the facts in the case at bar. Mr. Chief Justice Bean held as follows:

"In such a suit, a creditor making himself a party and proving his claim is entitled by relation to the benefit of the suit as virtually a party plaintiff from the beginning, and the time that elapsed from the commencement of the original suit to his becoming a party thereto will not be considered as a part of the time limited by the statute for the commencement of a suit or action on his claim. 'A bill filed by one creditor, as plaintiff, in behalf of himself and others,' says Mr. Angell, 'will prevent the statute from running against any of the creditors who came in under the decree.

Every creditor has, after the filing of a bill, an in-
choate interest in the suit to the extent of its being
considered as a demand, and to prevent his being shut
out because the plaintiff has not obtained a decree
within the six years.' Angell, Lim. (5th Ed.) Sec. 331.
This doctrine is recognized and enforced in cases simi-
lar to the one in hand by the Supreme Court of the
United States in *Richmond v. Irons,* 121 U. S. 27 (7
Sup. Ct. 788,) and of Ohio in *Barrick v. Gifford,* 47
Ohio St. 180 (21 Am. St. Rep. 798, 24 N. E. 259), and
referred to by Mr. Thompson in his recent work on
Corporations (3 Thomp. Corp. Sec. 3771.) It is unim-
portant, therefore, so far as the statute of limitations
is concerned, at what time the intervening creditors
become parties, if the original suit was commenced in
time; for, as each creditor appeared and proved his
claim, he had a right, as said in *Richmond v. Irons,
supra,* 'to be considered as a party complainant from
the beginning.' "

The case of *Richmond v. Iron, supra,* is very much
in point with the case at bar. In fact, the Illinois stat-
ute of limitations was invoked as a defense. Mr. Jus-
tice Matthews, speaking for the court, said (p. 51):

"The assignment of error next to be considered
arises upon the defense made on behalf of the defend-
ants below, of the statute of limitations. The limita-
tion relied upon is that prescribed by an act of Illinois,
which provides that 'actions on unwritten contracts,
express or implied, or on awards of arbitration, or
to recover damages for an injury to property, real
or personal, or to recover the possession of personal
property, or damages for the detention or conversion
thereof, and all civil actions, not otherwise provided
for, shall be commenced within five years next after
the cause of action accrued.' Pub. Laws Ill. 1871-2,
559, Sec. 15; Hurd's Rev. Stat. Ill. 1881, 705 [J. & A.
¶ 7210.]

"It is not necessary to decide in this case whether
the statute of Illinois relied upon is applicable, be-
cause in the view which we have already taken of the

nature of the amended bill filed in October, 1876, the statute, if applicable, ceased to run against the creditors of the bank entitled to the benefit of the decree, at that date. That amended bill is to be considered from the date of its filing, as a bill on behalf of all the creditors of the bank who should come in under it and prove their claims. When any creditor appeared during the progress of the cause to set up and establish his claim, it was necessary for him to prove that at the time of filing the bill he was a creditor of the bank; any defense which existed at that time to his claim, either to diminish or defeat it, might be interposed either before the master or on the hearing to the court. The creditor, having established his claim, became entitled to the benefit of the proceeding as virtually a party complainant from the beginning, and the time that had elapsed from the filing of the bill to the proof of his claim would not be counted as a part of the time relied on to bar the creditor's right to sue the stockholders. In other words, if he proves himself to be a creditor with a valid claim against the bank, he becomes a complainant by relation to the time of the filing of the bill. This being so, it is not disputed that in October, 1876, the bar of the statute had not taken effect, even on the supposition that the statute applied.''

This case also meets the contention of the appellants that in the course of the bill there are allegations which seem inconsistent with the claim that the bill was brought on behalf of all creditors.

While the facts in *Iberg v. Webb*, 96 Ill. 415, are not similar to those in the case at bar, yet the language of the court is in accord with the principle contended for herein; as will appear from the following language (p. 419):

''A bill filed by one creditor, as plaintiff, in behalf of himself and others, will prevent the statute from running against any of the creditors, who come in under the decree. Every creditor has, after the filing of a bill, an inchoate interest in the suit, to the extent of

its being considered as a demand, and to prevent his being shut out, because the plaintiff has not obtained a decree within the six years.''

The holding in the case of *Parmelee v. Price*, 208 Ill. 544, relied on by appellants, is not inconsistent with the views expressed in the foregoing citations. We are, therefore, of the opinion that under the facts and circumstances in evidence, the court properly allowed the claim of Frank Hall.

Appellants, however, further contend with reference to the claim of Frank Hall, that upon the hearing before the master they had not made defense as to the merits of the claim and therefore when the court, prior to the formal entering of the decree, announced its decision to uphold the Hall claim, they asked for a re-reference of this particular claim ''to take such evidence as may be offered by said defendants or any of them on any legal or equitable defense they or either of them may have to the said claim of Frank Hall.''

At the time of the hearing, after the evidence of the claimant Frank Hall had been submitted, the claimant asked for a rule upon all parties in interest to close proofs on the claim of Frank Hall, which was objected to; but the master entered a rule on December 6, 1904, that defendants close proof within thirty days. On December 8th, Mr. Wolseley, on behalf of the defendants, asked the master to report to the court recommending the disallowance of the claim of Frank Hall, *upon the evidence already taken in the case* and on the objections filed to said claim. This motion was set for December 9, 1904, and was argued before the master January 12 to 14, 1905. On March 29, 1906, the master prepared a report upon this motion and argument, wherein he sustained the contention of the defendants, among whom were the appellants, that the claim should be disallowed as to the defendants, upon the

ground stated in the objection, that it was barred by the statute of limitations.

While this report was prepared March 29, 1906, and objections were made thereto by Frank Hall, it was not filed in court until June, 1911, together with the report on the general case; and in this report on the general case, the master stated that for the purpose of saving a re-reference of the case and for the information of the court, he found the amount due on said bonds held by Hall which were the subject-matter of his petition; and by this statement the master evidently was of the opinion that there was sufficient evidence to sustain the claim of Frank Hall, his recommendation for disallowance being based upon application of the statute of limitations to the claim. That this was the theory of the master is further evidenced by the seventh conclusion in the general report, which is as follows:

"Should the court sustain the petition of Frank Hall and overrule the plea of limitations filed herein, a decree should be entered herein adjudging said stockholders to be liable for the payment of the claim of said Hall, and a decree should be entered accordingly."

During the five years that elapsed between the preparation of the report and the filing thereof, and for more than a year thereafter, no effort was made by the defendants to introduce any evidence. They were content to rely upon the ruling of the master upon a question of law, and it was only when the court was about to enter the decree and had expressed an opinion that the exceptions to the master's report on the Hall claim would be sustained that the defendants sought a re-reference on this claim. We believe the ruling of the chancellor in refusing to grant the appellants' request for a re-reference was within his sound discretion; in fact, his ruling in that regard is upheld

by the case of *Koebel v. Doyle*, 256 Ill. 610, wherein Mr. Justice Cartwright, speaking for the court, says (p. 614):

"We do not recognize a practice of making a motion in a case on final hearing before a chancellor to dismiss the bill on the evidence submitted at any stage of the case. This cause was on hearing before the chancellor for a final decision on the merits, where the parties were at liberty to introduce such evidence as they had to establish a right to the relief prayed for or to show good defense. To permit such a motion would result in hearing a case by piece-meal, the sustaining of a motion resulting in an appeal and on a reversal another hearing on more evidence, followed, perhaps, by another appeal. The party has a right to submit his cause to the chancellor upon the evidence adduced if he sees fit, and the motion, if made, was neither more nor less than a submission of the cause to the chancellor."

The additional errors assigned by appellants, viz., that the books and papers of the Chicago Exchange were incompetent evidence, and that the prospectus subscription agreement was a void and unilateral agreement, in our opinion, are not well taken.

Finding no reversible error, the decree of the Circuit Court will be affirmed as to each and all of the appellants.

*Affirmed.*